Marion A. LOVE and Wilma Love, Plaintiffs/Appellants,

v.

DEERE AND COMPANY, John Deere Company, and Louisiana Farm Supply Company, Inc., Defendants/Respondents.

No. WD 35063.

Missouri Court of Appeals, Western District.

Jan. 2, 1985.

Fred Wilkins, Stephen B. Millin, Jr., Wilkins & Millin, P.C., Kansas City, for plaintiffs/appellants.

Thomas J. Wheatley, Daniel M. Dibble, Thomas S. Stewart, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, for Deere & Co.

Darwin E. Johnson, Linde, Thomson, Fairchild & Langworthy, Kansas City, for Louisiana Farm.

Before CLARK, P.J., and PRITCHARD and LOWENSTEIN, JJ.

CLARK, Presiding Judge.

After plaintiffs, Marion and Wilma Love, had verdicts from a jury for actual and punitive damages aggregating $550,000, the trial judge ordered a new trial on the

ground that the evidence had not warranted submission of a claim for punitive damages and the resultant verdicts had been so infected by the error that deletion of the punitive award could not expunge the prejudice to defendants. The appeal is from the new trial order. Affirmed.

█ Some clarification of issue formulation in terms of procedure in the case is appropriate at the outset of this opinion to set the contestants in their adversary roles. The defendants at trial, respondents here, filed their customary motions after verdict seeking, in the alternative, judgment in their favor in accordance with motions for directed verdicts at the close of the evidence or, a new trial. The latter relief was granted which, of necessity, effected a denial of respondents' motions for judgment n.o.v. That inferred ruling is not before this court in the form of an appeal by respondents. We are, however, obliged to confront the question of whether appellants made a submissible case and whether the ruling on respondents' motions for judgment was correct. The following authorities demonstrate the entitlement of a successful new trial movant to challenge plaintiffs' case even though plaintiff is before the appellate court as appellant.

█ A recent case on the subject is *Mrad v. Missouri Edison Co.*, 649 S.W.2d 936 (Mo.App.1983). There, an appeal from the denial of defendant's motion for judgment n.o.v. had been dismissed and the case was before the court on appeal from the new trial order. Respondent charged in brief and argument that plaintiff had made no case at trial. The opinion held that dismissal of defendants' appeal did not foreclose a challenge to the submissibility of the case. Where the record shows plaintiff cannot recover under the law and evidence, another trial is to be spared by entry of directed judgment. *Mrad* at p. 942. To like effect, *see State ex rel. Mather v. Carnes*, 551 S.W.2d 272 (Mo.App.1977). Of course, this entitlement of a respondent to proceed in the role of an appellant as to the issue of submissibility is conditioned upon preservation of the point through motions

presented during trial and after verdict. *Schmittzehe v. City of Cape Girardeau*, 327 S.W.2d 918 (Mo.1959).

Here, respondents argue that appellants did not make a submissible case of liability because (a) there was no evidence of causative effect between the product defect and the injury, (b) the product had been materially altered after its manufacture, and (c) the product was not being operated at the time of the accident in a manner reasonably to be anticipated by respondents. These contentions lead now to a summary of the facts of the accident in which appellant Marion Love suffered the loss of his right hand.

On October 11, 1979, harvesting of soybeans on land rented by Love was in progress. During the day, the work was done by Jack Hobbs using a combine owned by him, purchased from Louisiana Farm Supply Co. Inc., manufactured by Deere and Company and distributed by John Deere Co., all respondents in this case. That evening, Love, who had engaged in other work during the day, undertook to continue the harvest with Hobbs' combine. Some clogging of the combine feederhouse occurred and Love removed the material by hand. In this process, the combining function of the machine was shutdown, as was Hobbs' practice, so that no moving parts were operative in that area of the equipment. The engine continued to run, however, as did the belts and sheaves of the ground drive. This maneuver was successfully and uneventfully accomplished.

At about 10:00 p.m., a second clogging occurred. Because of the lateness of the hour, Love decided to cease work. He first shut off the combining function, dismounted from the cab and walked to the left side of the machine heading for the ladder intending to shut off the engine and the lights. This was the opposite side of the combine from that where the inspection port of the feederhouse for cleanout was located. As Love walked along the uneven ground, he stumbled falling toward the machine where his hand became entangled in

the moving machinery. There were no other witnesses to the occurrence. Love managed to make his way to his brother's house from which he was taken to the hospital for medical treatment lasting some 28 days. Total medical bills incurred amounted to $26,079.39.

## SUBMISSIBILITY OF THE CLAIM

Plaintiffs' cause against the manufacturer, distributor and retailer of the combine was based on the *Restatement (Second) of Torts § 402 A (1965)* theory of products liability and was submitted to the jury under MAI No. 25.04 (2nd Ed.). In particular, the manufacturing and design defect associated with Love's injury was the unguarded area of belts and pulleys to the left side of the combine and into which Love's hand became entangled. Some further explanation of how the area stood unguarded is necessary to understand the theory of the case.

As the combine was originally manufactured and sold to Hobbs new in 1976, the area in question was guarded by a "banana" shield, so named for its shape. When Love sustained his injury, the shield was not on the combine. Unknown to Love or Hobbs, the shield had apparently fallen off earlier that day because it was later found in the field where Hobbs had been working the combine. This was not the first time Hobbs had experienced difficulty with the shield. At an earlier date, the bolts which attached the shield had broken in the block requiring center drilling to remove the bolt ends. Hobbs reattached the shield by drilling new holes and supplying other bolts. Although the shield itself had fractured toward the rear of the combine at or before the shearing of the attachment bolts, the shield did remain attached with the new bolts Hobbs provided until the detachment which evidently occurred October 11, 1979.

According to plaintiffs' expert witness Gibson, the banana shield fractured as a result of sympathetic vibration with the belt and pulley mechanism to which it was attached. The shield itself was of flexible material and the vibration flexure alternately put one area of the shield in tension and the other in compression. Material fatigue and ultimate fracture were the consequence. The cyclical vibrations in effect produced inevitable self-destruction.

Respondents first argue that plaintiffs made no case of defective design of the shield because there was no proof the injury would have occurred if the shield had been in place at the time of the accident. This contention assumes plaintiffs' complaint to have been that the design of the shield was inadequate to guard the machinery it covered. As ultimately presented to the jury, however, the case dealt not at all with the guarding properties of the shield in place. The defect upon which plaintiffs relied was the design which failed to account for the flexion fatigue and the ultimate disconnection of the shield. It is correct that evidence of other possible shield configurations was introduced but that evidence, as later described in this opinion, went to show superior attachment methods and the knowledge by respondents of shield failure and the hazards presented. The adequacy of the banana shield to guard the machinery when in its original configuration was irrelevant to plaintiffs' case and, in fact, was a subject expressly withdrawn from the jury's consideration. For purposes of the claim, the assumption may be indulged, without detracting at all from the plaintiffs' substantive burden of proof, that the shield would have protected Love from injury had it remained attached to the combine.

■ In sum, the evidence was sufficient to show that the shield designed and intended to guard the belts and pulleys fell off the Model 4400 Deere Combine due to fatigue failure resulting from a design defect existing at the time of manufacture of the combine. As a consequence, when Love fell toward the machine, nothing protected him from the dangerous moving parts.

Respondents next assert that they suffer no liability exposure because of Hobbs' action in reattaching the shield after it frac-

tured and fell from the combine the first time. They argue that Hobbs' reattachment efforts were inadequate to secure the shield properly, that the shield fell for the last time, not because of the design defect, but because of amateur, home workshop repair, and that Hobbs' reattachment was an intervening cause relieving respondents of any liability flowing from the original failure. In effect, what respondents contend is that if Hobbs had brought the combine in for or had procured adequate reattachment of the shield, it would have been in place on October 11, 1979.

■ The subject of proximate causation by intervening events and circumstances was exhaustively treated in the recent case of *Clary v. United Telephone Co.*, 670 S.W.2d 936 (Mo.App.1984) from which we borrow the following extracts. Generally, it is sufficient to constitute proximate cause that the negligence charged was the efficient cause which set in motion the chain of circumstances leading to the injury. An intervening resulting cause is a new and independent force which so interrupts the chain of events initiated by defendant's negligence as to become the responsible, direct, proximate cause of the injury. The first cause becomes the remote cause and the intervening cause the proximate cause only when the chain of events is so broken that the result is no longer the natural and probable consequence of the primary cause or one which ought to have been anticipated.

■ In the present case, the banana shield first fell from the combine, according to plaintiffs' evidence, because the design and placement of the shield subjected it to stress and fracture. Love's injury was attributable to the original insecure attachment of the shield which was the consequence of respondents' faulty design. Once the shield first separated from the combine, the safety function was lost and the exposure of users to the hazard commenced. The temporary repair by Hobbs played no part in Love's injury because the belts and pulleys were exposed and unguarded when the shield first broke and

fell and in like manner when Love sustained the injury. The unsuccessful reattachment of the shield by Hobbs did not interrupt the chain of events caused originally by the product defect and, thus, could not be an event of intervening proximate causation.

■ Despite the foregoing, even were it to be argued that in some way Hobbs' repair enhanced the likelihood that the shield would fail, the evidence as to that work as well as plaintiffs' evidence of the original product defect was all presented to the jury. In such a situation, the issue of proximate cause and intervening efficient cause is for the jury to decide. *Clary v. United Telephone Co., supra.*

Respondents next contend plaintiffs' case did not meet the requirements of § 402 A in that the Hobbs' repair to the shield with improper bolts materially altered the machine and when used thereafter with the reattached shield and without recourse to factory or dealer service, the operation was in a manner not reasonably to be anticipated by respondents. The argument seems to be that once the failure of the shield became manifest, it was the obligation of the user to seek competent repair service or replacement.

■ As to material alteration of the machine, the contention is without any support on the facts. When the shield first failed as a result of component fatigue, the attachment bolts on the outside of the shield sheered off in the block leaving the shield hanging by a round eye cable bolt. The fracture point on the shield was toward the rear of the combine, the broken bolts were at the front. At that point, the shield was useless. Hobbs' repair, although temporary as later events demonstrated, did not render the combine more dangerous but safer as compared to the condition which existed immediately before the repair. Neither the original attachment of the shield at the time of manufacture nor the attachment substitute improvised by Hobbs eliminated the potential danger and thus there was no material

alteration because the same unsafe condition persisted throughout.

■ The claim of unanticipated use, that is, use of the machine with the shield insecurely reattached, is equally insubstantial. When Love's accident happened, the machine was in use for its designed purpose to combine crops. There is nothing unforeseeable about the continued use of the combine after failure of the shield. In fact, the evidence showed that respondent was aware farmers would not interrupt their work because a guard shield became detached, but were more likely to postpone repair of a component which did not directly serve the combining function.

The case relied on by respondents, *Baker v. International Harvester Co.,* 660 S.W.2d 21 (Mo.App.1983), presented an entirely different fact situation. There, the victim was riding on the ladder of the combine to hunt game while the combine was in motion. The operator was unaware of the hunter's presence until the accident occurred. That use of the combine as a hunting vehicle was determined not to be foreseeable or reasonably to be anticipated by the manufacturer and disqualified the claim from submission on a products liability theory. There was no such deviate use here, but rather the precise use for which the machine had been constructed.

■ Considering the evidence here in the light most favorable to plaintiffs and giving them the benefit of reasonable inferences, *Buckner v. Pillsbury Co.,* 661 S.W.2d 626 (Mo.App.1983), a submissible case was made.

## THE AWARD OF A NEW TRIAL

As was noted earlier in this opinion, the propriety of the order granting a new trial turns on the issue of whether it was error to admit evidence and argument on, and to submit to the jury the question of, punitive damages. The proof tendered in support of the claim to punitive damages consisted of evidence obtained from respondents' files in discovery. Particularly relevant was an intra-company communication written in February, 1973 and identified as the "Barquist Memo." The gist of the claim was that the evidence as a whole demonstrated Deere's awareness of the failure propensities of the banana shield as early as 1973 but, with indifference to and conscious disregard for the safety of combine users, respondents continued to manufacture and distribute the defective product through 1975 when the Hobbs combine was purchased.

■ The trial judge decided after verdict that there had been no substantial or persuasive evidence supporting a claim for punitive damages, but he did not elaborate on the basis for that decision. On well recognized authority, however, we are obligated to affirm the decision if sustainable on any ground in the record. *Linkogel v. Baker Protective Services, Inc.,* 626 S.W.2d 380 (Mo.App.1981).

Evidence as to the production, testing and modification by Deere of the various combine shield parts is voluminous and somewhat confusing, particularly from a cold record. Some details, however, appear without dispute. The banana shield design and structure referred to in the Barquist Memo was in production in 1973 and was identified as part number AH79310. The failure rate of that shield, acknowledged by Deere personnel to be unacceptable, was recognized as early as 1973. Apparently some combines were continued to be produced and sold with the defective shield even after Deere was aware of the hazard to users. The Hobbs combine was not one of those machines. It was manufactured in 1976 and the banana shield with which it was equipped bore part number AH89654. The evidence was that shield AH89654 was used only in the production years 1975 and 1976 and, according to Deere's warranty claim records, only 10 shields failed on the 7,000 model 4400 combines produced in those years. This failure rate was a marked improvement over the failure rate for the earlier AH79310 shield.

Evidence also was introduced showing testing by Deere of various shield designs after the Barquist Memo, but little if any

proof as to tangible accomplishments. An experimental shield, identified as AQ273–6139C was designed but it was found to be less satisfactory than the original shield. Attempts to reinforce the shield only resulted in moving the fracture point to a different area. On the one hand, it is clear that after the shield problem came to the attention of respondents and was recognizable as a safety hazard, corrective efforts were undertaken. On the other, however, plaintiffs' evidence demonstrated that the shield on the Hobbs combine was basically the same flawed design as had been noted in the Barquist Memo, notwithstanding change in the part number and the intervening modifications.

The difficulty with plaintiffs' proof as to punitive damages was that it relied on documentation of actual knowledge by Deere that shield AH79310 was defective, but that was not the identified shield on the Hobbs combine. It is one thing to prove by expert evidence, as plaintiff did, that the two shields were basically the same and equally prone to failure, but it is quite another matter to show indifference and conscious disregard by Deere in the face of uncontroverted proof that the subsequent shield was introduced into production after added design consideration and tests.

■ To sustain the punitive damage claim, it was necessary for plaintiffs to adduce evidence that respondents knew at the time the Hobbs combine was sold that the modifications to reinforce the shield had been ineffective and that the combine was defective and dangerous because of potential shield failure. To the contrary, the evidence was that the two shields were distinguishable in that the later shield was a modified product. If plaintiffs are to muster a punitive damage claim on retrial they will be obliged to prove not only the absence of any substantial change in the shield with which the Hobbs combine was equipped, but actual knowledge by Deere of a persisting design flaw surviving the modification efforts and a decision to continue production into the 1976 model year notwithstanding the defect. For want of

this latter element, plaintiffs made no case for punitive damages in this trial.

■ As to the relief granted by way of a new trial, the trial judge was particularly emphatic in expressing his opinion that the award for actual damages was irreparably affected by the argument and submission as to punitive damages. We are inclined to agree, although the amount of the award in actual damages, $100,000, can scarcely be labeled excessive considering the extent of injury. In any event, plaintiffs present no argument for reinstatement of the actual damage award as sole recovery, but continue to claim entitlement to punitive damages. The new trial order must therefore stand.

The judgment is affirmed.

All concur.