Frederick Wells BELLINGER, Jr., a/k/a Patrick Erker, Plaintiff–Appellant,

v.

The BOATMEN'S NATIONAL BANK OF ST. LOUIS, et al., Defendants–Respondents.

No. 54973.

Missouri Court of Appeals, Eastern District, Division Four.

Sept. 19, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 25, 1989.

Application to Transfer Denied Dec. 12, 1989.

William J. Travis, St. Louis, for plaintiff-appellant.

Robert B. Hoemeke, St. Louis, for defendants-respondents.

STEPHAN, Judge.

Frederick Wells Bellinger, Jr., a/k/a Patrick Erker, filed this action for a declaratory judgment seeking a decree of equitable adoption so that he could be adjudged and decreed to be the adopted son of Otto Erker who died intestate on April 11, 1985. The action was filed against Boatmen's Na-

tional Bank of St. Louis as administrator of Otto's estate,[1] along with Otto's natural daughters, Marianna Sherrill Erker Cross ("Rianna") and Antoinette Sherrill Erker Chatham ("Tonette"). The trial court, sitting without a jury, entered judgment in favor of the defendants and Patrick appeals.

Marian Sherrill and Frederick Wells Bellinger ("Ricky") were married September 5, 1945 and had two children: Marian S. Bellinger ("Sherry") and Frederick Wells Bellinger, Jr. ("Patrick"). Marian and Ricky were divorced on January 3, 1952 and Marian was given custody of the children. Marian subsequently married Otto Erker on May 22, 1953. Two daughters, Rianna and Tonette, were born of this marriage.

Otto was born Otto A. Roeslein in 1912. He was raised by Mr. and Mrs. Adolph P. Erker, his aunt and uncle, who were appointed guardians for Otto and his younger sister Anita after their mother passed away. Otto and Anita were never adopted by the Erkers, but Otto subsequently filed a petition to formally change his name from Otto A. Roeslein to Otto A. Roeslein Erker, which was granted.

Patrick and Sherry both assumed and used the surname "Erker" after Marian and Otto married. There was testimony that they were generally known by the name "Erker", and that all four children, Sherry, Patrick, Rianna and Tonette, were treated exactly alike.[2]

In 1954 Patrick was enrolled at Rossman School as "Pat Bellinger Erker". His school record listed Otto as step-father. He attended Whitfield School from 1960–1966 as "Patrick Bellinger Erker". In the "comments" section of his Whitfield school record, it stated, "His mother and father are divorced, and he lives with his mother and stepfather."

A number of people, including Otto's sister and nephew, testified that Patrick was generally known as "Patrick Erker" and

---

**1.** The first names of the parties will be used to facilitate identification.

**2.** Sherry was killed in an accident on December 24, 1965. Her gravemarker and the published notice of death both identified her as Marian Sherrill Erker.

that Otto felt equal responsibility toward all the children. Otto referred to them as "the children" with no distinctions. Generally, Otto called Patrick "son" and Patrick referred to Otto as "pop". The entire family vacationed together, all of the children included, in Michigan where Patrick was also known as "Erker". There was, however, also evidence that Patrick's pedigree was known.

Otto bestowed gifts and affection on Patrick. He introduced Patrick to an elite organization, The Colonel's Club, to which he belonged. Otto applied and paid the $1000 membership fee so that Patrick could become a member of the St. Louis Club. For Patrick's twenty-second birthday Otto gave him a check with the inscription, "For Being the best son any father could wish for." Otto also assisted Patrick in several business ventures.

Patrick used the last name "Erker" from 1953 until approximately 1974.[3] He testified that he was unaware that Otto was his stepfather, as opposed to his natural father, until he reached the age of twelve or thirteen. Patrick saw his natural father, Ricky, approximately four times prior to 1968, when Otto and Marian divorced. He always called Otto "pop" or "father" and his natural father was Ricky. Patrick did attend Ricky's funeral in 1980 and received a small bequest from Ricky's estate.

Marian and Otto were divorced in 1968. Patrick, who was nineteen at the time, chose to remain with Otto. He felt that his mother had, more or less, abandoned him. He considered himself estranged from his mother and felt very close to Otto. Marian and Otto both sought custody of Rianna and Tonette. In his motion for custody, Otto stated:

7. By awarding custody of the children to defendant said children would be maintained in the same home and live with their older half brother who currently resides with defendant by choice, and for whom said children have great love, affection and admiration, and with

whom the children desire to spend a considerable amount of time.

Custody was granted to Otto in 1968 and later, in 1970, when Marian once again petitioned for custody of the girls. During the course of these proceedings in 1970, Otto gave the following deposition testimony:

Q. Who else lives there at No. 1 Portland Place besides you?

A. Well, my son Patrick, who is Marian Erker's son by a former marriage.

Q. Have you adopted him?

A. Not formally.

Q. But he takes your name?

A. He does.

Copies or duplicate originals of Otto's state and federal tax returns for the years 1956 through 1972 were admitted. There are joint returns filed by Otto and Marian for the years 1956 to 1967, and individual returns for 1968 and following. All the returns through 1971 claim an exemption for Patrick as Otto's dependent. The Missouri returns through 1960 and the federal returns for the years 1961, 1962, 1963, 1965 and 1966 list Patrick as "son".

An abundance of documentation was provided which indicated Patrick was known as "Erker". In 1963, a social security number was issued to Patrick B. Erker; Selective Service had him registered as Patrick Bellinger Erker; he was enrolled at various schools as Patrick Erker; his driver's license, pilot's license and confirmation certificate were also issued to Patrick Erker. After 1972, he began using both names, and even had the name on a life insurance policy changed to "Bellinger". Patrick also produced letters addressed to him, both as Patrick Erker and as Patrick Bellinger, at #1 Portland Place.

With the exception of Patrick's own testimony, no evidence was presented which indicated Otto's intentions regarding adoption. Patrick testified that Otto promised to adopt him on three separate occasions,

---

**3.** Patrick currently uses both surnames, Bellinger and Erker, as well as a registered fictitious name, Richard Berker.

but no one else corroborated these conversations.

The trial court issued a Memorandum Opinion. It found that Patrick had not met the high burden of proof necessary in an equitable adoption proceeding and, therefore, found in favor of the defendants. We affirm.

Patrick raises three points on appeal: first, that the trial court erred in ruling that Patrick was not equitably adopted because Otto's estate and heirs are judicially estopped to deny Otto's de facto adoption of Patrick; second, that the trial court erred in denying Patrick's prayer for equitable adoption because Otto's estate is estopped to deny that Otto's conduct showed he intended to adopt Patrick; third, and alternatively, that the trial court erred in ruling that Patrick was not equitably adopted by Otto because the judgment goes against the weight of the evidence.

■ The general standard of review which applies to equitable, non-jury cases is that we will sustain the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Furthermore, a plaintiff seeking a decree of equitable adoption must establish its existence with evidence so clear, cogent and convincing as to leave no room for reasonable doubt. *In the Matter of the Estate of Van Cleave*, 610 S.W.2d 620, 622 (Mo. banc 1981). If the plaintiff seeks to establish an equitable adoption through the use of circumstantial evidence, then the evidence must be consistent only with the existence of the equitable adoption and inconsistent with any other reasonable hypothesis leaving nothing to conjecture. *Niehaus v. Madden*, 348 Mo. 770, 155 S.W.2d 141, 144 (1941).

Patrick first claims that the estate is judicially estopped from denying Otto's de facto adoption of Patrick because: 1) Otto testified under oath during the 1970 custody action that Patrick was "my son"; 2) Otto used the fact that Patrick remained with him at #1 Portland Place after the divorce as a basis for persuading the court to grant him custody of Rianna and Tonette; and, 3) Otto declared, under penalty of perjury, that Patrick was his dependent child or son on state and federal tax returns.

■ The doctrine of judicial estoppel holds that a person who states facts under oath, during the course of a trial, is estopped to deny such facts in a second suit, even though the parties in the second suit may not be the same as those in the first. *Lillo v. Thee*, 676 S.W.2d 77, 81 (Mo.App.1984). Patrick argues that Otto's 1970 deposition testimony constitutes an admission and judicially estops Otto's estate from denying Patrick's adoption. He fails to point out, however, that the answer was qualified, twice. Otto explained that Patrick is Marian's son by a former marriage and that Otto never formally adopted him.

Patrick reasons that Otto, who was an attorney, must have been aware of the legal implications of his conduct toward Patrick, and, therefore, Otto's response was entirely consistent with equitable adoption. We find, however, that this testimony is neither an agreement nor an intention to adopt. We decline to read anything into the statement. The purpose of the testimony was merely to identify who was then living in Otto's home. Otto's response, identifying Patrick as "my son", was qualified to the extent that the statement was equivocal.

■ Otto's testimony also suggested that Patrick used the surname "Erker" with Otto's consent. This fact, it is argued, estops the estate from denying the adoption. We do not agree. It is not unusual and is of little significance that Patrick took the name Erker, as his mother did when she married Otto, and that he would be introduced and referred to as such. Cf. *Capps v. Adamson*, 362 Mo. 539, 242 S.W.2d 556, 560 (1951).

Patrick next argues that Otto used him to gain custody of Rianna and Tonette during the divorce proceedings. Otto's petition prayed that one reason he should be

given custody of the girls was so that they could maintain a relationship with their older half brother, who resided with Otto by choice. We fail to see the significance of this pleading. Patrick *is* the older half brother of Rianna and Tonette. That fact does not, however, suggest that he was the son or the adopted son of Otto. We have reviewed the pleadings and the orders from both custody proceedings and find no assertion by Otto that he had adopted Patrick.

■ Lastly, under Point I, it is argued that since Otto declared Patrick as his dependent child or son on federal and state tax returns, his estate is judicially estopped from denying the adoption. Otto had every right, at least within proper tax guidelines, to claim Patrick as a dependent while Patrick lived in his home and Otto provided for him. The fact that he might have used the word "son" to describe Patrick on some of the forms is inconsequential. Tax forms, as a rule, do not leave much room for explanation. Moreover, the tax returns do not serve as judicial estoppel because, while they are signed under penalty of perjury, they were not given under oath during the course of a trial. *Lillo v. Thee,* 676 S.W.2d at 81. Point I is denied in its entirety.

In his second point, Patrick claims trial court error in denying his prayer for equitable adoption because Otto's conduct and declarations clearly prove a de facto adoption and an intent to adopt formally. We disagree and find that the evidence presented which showed a relationship between Patrick and Otto was insufficient to establish an equitable adoption.

There have been a number of cases in Missouri that have dealt with the question of adoption by estoppel.[4] In *Benjamin v. Cronan,* 338 Mo. 1177, 93 S.W.2d 975 (1936), the Supreme Court considered the following facts: 1) the Benjamins took plaintiff into their home when he was very young; 2) plaintiff took their name, with their consent, and probably by their di-

rection; 3) they introduced and spoke of plaintiff as their son and loved and treated him as a natural son and he deported himself towards them as a natural son; 4) in the codicil to his will, Mr. Benjamin referred to plaintiff as "my adopted son"; 5) in her petition to admit her husband's will to probate, Mrs. Benjamin, in setting out her husband's heirs at law, designated plaintiff as "adopted son"; 6) Mrs. Benjamin wrote to plaintiff and his wife, addressed them as "Dear children" and signed herself "Mamma". *Id.* 93 S.W.2d at 979. This evidence was found, however, to be insufficient to support a decree of equitable adoption under any theory. The court noted that the standard of proof in equitable adoption cases is very high and that courts must be very careful not to lower those standards because the danger of unfounded claims against someone after death would then become great. *Id.* at 981.

■ In the instant case, Otto's declarations that he intended to adopt Patrick were uncorroborated. While many witnesses testified that a strong relationship existed between Otto and Patrick, there were also witnesses who stated their relationship was merely tolerant and that Otto always preferred Sherry and the other girls over Patrick. Otto's alleged declarations and his relationship with Patrick are not clear and satisfactory proof of an equitable adoption.

In *Lynn v. Hockaday,* 162 Mo. 111, 61 S.W. 885 (1901), in which the Supreme Court did decree an equitable adoption, the child was given to Mr. and Mrs. Lynn on the condition that she be raised as their own. The child was taught to believe that the Lynns were her natural parents, and she believed they were her natural parents until she was grown. She was never told about her blood relations. Patrick knew, at least by the age of twelve or thirteen, that he was not Otto's son. He visited with his natural father on occasion. The fact that the visits were infrequent and unenthusias-

---

4. We note many of the early cases are not exactly on point because they involve written contracts with the Children's Home Society. We still find that these cases are, however, authoritative.

tic is inconsequential. No evidence was presented to suggest that Ricky gave up all rights to his children or that Otto attempted to take them away from him. In fact it was Otto who suggested Patrick should attend Ricky's funeral.

In both *Long v. Willey*, 391 S.W.2d 301 (Mo.1965) and and *Mize v. Sims*, 516 S.W.2d 561 (Mo.App.1974), there were definite, unequivocal expressions of intent to adopt. In *Mize*, the alleged adoptive parent even attempted to do so. *Id.* at 563. We are unable to find such declarations here, but Patrick argues that it is not necessary for the alleged adoptive parent to expressly declare his intent to adopt, the maintenance of the relationship being enough. *Holloway v. Jones*, 246 S.W. 587, 591 (Mo.1922).

We agree that actions may speak louder than words. In this case, however, we do not find that the actions only suggest an equitable adoption, they do not prove its existence so cogently, clearly and convincingly as to leave no room for reasonable doubt. *In the Matter of the Estate of Van Cleave*, 610 S.W.2d at 622. Otto referred to Patrick as "my son", supported him, introduced him to friends and to the business community, and, in general, developed a good relationship with him. These facts might suggest an equitable adoption, but they also indicate a good stepson/stepfather relationship.

The trial court took Patrick's testimony, that Otto expressed an intent to adopt him, into account. It determined that this was probably a "sentimental misrepresentation" on Otto's part. Patrick argues that the trial court was not in a position to determine Otto's credibility since Otto did not testify in person. We have reviewed the documentary evidence and the transcript, and have determined that the trial court's conclusions are not based only on Otto's statements, but also on the testimony of the live witnesses, both present and by deposition, including Patrick. We find no error.

Patrick failed to present sufficient evidence of Otto's intent to adopt him. An equitable adoption will be decreed only where justice, equity and good faith require it. We find no indication that such an order is required here. Point II is denied.

In his last point Patrick argues that the judgment of the trial court is against the weight of the evidence. We have already reviewed the evidence in some detail and find that it supports the judgment. Further discussion would serve no purpose. Point III is therefore denied pursuant to Rule 84.16(b).

The judgment of the trial court is affirmed.

SMITH, P.J., and SATZ, J., concur.