Chandrika C. COLLINS and Chad T. Collins, Appellants,

v.

MISSOURI BAR PLAN, as defendant ad litem for Barry Anderson, Strong and Strong, Sanford P. Krigel, Krigel and Krigel, P.C., Respondents,

and

Samuel C. Totaro, Jr., Eugene E. Kellis, Howard H. Soffer, Holly Kellis Soffer, Michael J. Belfonte, Tammy Thompson, and Janet Wake–Larison, Defendants.

No. WD 63003.

Missouri Court of Appeals, Western District.

Jan. 11, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 1, 2005.

Application for Transfer Denied April 5, 2005.

Michael Taylor, St. Joseph, Robert Langdon, Lexington, for Appellant.

James Morrow, James Ensz, Kansas City, for Respondent.

PAUL M. SPINDEN, Judge.

After protracted litigation over adoption of the infant son of Chad T. and Chandrika C. Collins by a Pennsylvania couple, the Collinses sued a number of individuals involved in the adoption, including all of the attorneys. They charged the attorneys with malpractice, breach of fiduciary duty, and negligent misrepresentation. This appeal concerns only two of the attorneys, Barry Anderson, deceased, and his law firm, Strong and Strong, and Sanford P. Krigel and his law firm, Krigel and Krigel. The circuit court entered summary judgment for these attorneys. The circuit court erred in granting summary judgment, and we remand for further proceedings.

In reviewing this case and in setting out the facts below, we view the evidence in a light most favorable to the Collinses. This is because, when we review an appeal of a summary judgment, we view the evidence in a light most favorable to the nonmoving party, and we afford that party the benefit of all reasonable inferences. *ITT Commercial Finance Corporation v. Mid–America Marine Supply Corporation*, 854 S.W.2d 371, 382 (Mo. banc 1993).

This lawsuit arose from the Collinses' consent during 1995 to the adoption of their son by Joseph and Diane Standen, a married couple living in Pennsylvania. The Standens hired Samuel C. Totaro, Jr., a lawyer in Furlong, Pennsylvania, to help them with the adoption. Totaro hired Krigel, a lawyer in Kansas City, to represent the Collinses. Viewed in a light most favorable to the Collinses, evidence presented to the circuit court indicated that Krigel advised Chandrika Collins concerning the law and assured her that she could withdraw her consent to the adoption at any time before the adoption became final. Chandrika Collins believed that Krigel represented her as her attorney.

In early November 1995, Totaro also hired Anderson to represent the Collinses because the Collinses resided in St. Joseph. The Collinses believed that Krigel and Anderson both represented them. On November 21, the Collinses met with Anderson, and he advised the Collinses concerning the law. He told them that they could withdraw their consent to the adoption at any time before the adoption was final.

On December 10, 1995, the Collinses' son was born. The Collinses met with Anderson the next day, and he explained adoption consent forms to them. At a hearing before the circuit court two days later, the Collinses, the Standens, and Anderson appeared, and the Collinses executed their consent to the adoption. The circuit court entered a temporary custody order transferring custody to the Standens.

On December 15, 1995, the Collinses decided to withdraw consent to the adoption. When the Collinses told the Standens of their decision, the Standens asked to see the infant one more time. The Collinses agreed, but when the Standens had physical custody of the child they locked themselves in their hotel room with the child and refused to return him to the Collinses. The Collinses telephoned Anderson, but he told them that he could not help them.

On December 19, 1995, the circuit court convened another hearing. The Collinses did not attend the hearing, and the circuit court ordered transfer of legal custody to

the Standens, who returned to Pennsylvania with the child.

Later in December 1995, the Collinses hired Janet Wake–Larison, a lawyer in Grant City, to aid them in regaining custody of their son. Wake–Larison filed a motion seeking the circuit court's leave for the Collinses to withdraw their consent to the adoption. The circuit court denied the motion because the motion did not allege grounds for which the circuit court could grant relief. This court affirmed the circuit court's decision in *In Interest of D.C.C.,* 935 S.W.2d 657 (Mo.App.1996) (D.C.C.I).

After this court issued its opinion, the Collinses filed another motion to withdraw their consent, alleging various grounds, including fraud, misrepresentation, and duress. The circuit court dismissed this motion without a hearing on the ground that the Collinses were estopped from denying that they had consented to the adoption because of their original representations to the circuit court. In *In the Interest of D.C.C.,* 971 S.W.2d 843 (Mo.App.1998) (D.C.C.II), this court remanded the case for a hearing on the issues of fraud and misrepresentation. While the circuit court was considering the remand, the Collinses and the Standens settled their dispute by agreeing to joint custody.

After the settlement, the Collinses filed this lawsuit. They charged Anderson and his firm with malpractice, breach of fiduciary duty, and· negligent misrepresentation. They accused Krigel and his firm of malpractice and breach of fiduciary duty. The lawyers moved for summary judgment, and the circuit court granted the motions. Although the circuit court's order did not dispose of all of the Collinses' claims, the circuit court ruled, pursuant to Rule 74.01(b), that no reason justified delay of this appeal.

Our review of the circuit court's summary judgment is essentially *de novo.* *ITT Commercial Finance Corporation,* 854 S.W.2d at 376. To enter summary judgment, the circuit court must determine that the parties are not disputing any issue of material fact and that the party seeking summary judgment is entitled to judgment as a matter of law. *Id.* at 377; Rule 74.04(c)(6).

"The key to summary judgment is the undisputed right to judgment as a matter of law; not simply the absence of a fact question." *ITT Commercial Finance Corp.,* 854 S.W.2d at 380.

[A] "defending party" may establish a right to judgment by showing (1) facts that negate any one of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements, or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense.

*Id.* at 381 (emphasis omitted). Because summary judgment is "an extreme and drastic remedy," we exercise great caution in affirming it because the procedure cuts off the opposing party's day in court. *Id.* at 377. We must "sustain the trial court's award of summary judgment if the judgment can be sustained under any theory" supported by the summary judgment record. *Rodgers v. Czamanske,* 862 S.W.2d 453, 458 (Mo.App.1993) (citing *Zafft v. Eli Lilly & Company,* 676 S.W.2d 241, 243 (Mo. banc 1984)).

In its order granting summary judgment, the circuit court declared that it had "determine[d] as to [the lawyers] that the damage of which the [Collinses] complain[ed] was not directly and proximately

caused by the action of the [lawyers] as alleged in the [Collinses'] pending petition." The lawyers had argued to the circuit court that Wake–Larison's negligence was an intervening cause that cut off their liability. The circuit court erred in resting summary judgment on either Wake–Larison's alleged negligence being an intervening cause or on the Collinses' not showing that the attorneys caused their injury.

■■■■ To establish a claim for legal malpractice, a plaintiff must prove negligence and a causal connection between his or her attorney's negligence and the resulting injury. *Id.* "To prove damages and causation, the plaintiff must prove that, but for the attorney's negligence, the result of the underlying proceeding would have been different." *Id.* A defendant's conduct is the proximate cause of a plaintiff's injury when the injury is the natural and probable consequence of the conduct. *Schaffer v. Bess,* 822 S.W.2d 871, 876 (Mo. App.1991). Conduct by multiple defendants can be deemed to be the cause of a single injury, and each of the defendants can be liable if his negligence was an efficient cause of the plaintiff's injury "without which the injury would not have occurred." *Id.* at 876–77.

■■■■ An intervening cause breaks the chain of causation, and this doctrine can apply to an attorney malpractice case. *See Rodgers,* 862 S.W.2d at 458. "An intervening cause is a new and independent force which interrupts the chain of events initiated by the defendant's negligence in such a significant manner as to become the direct and proximate cause of the plaintiff's damages." *Id.* For a later cause to intervene sufficiently to cut off another defendant's liability for prior negligence, the later cause must break the chain of events so that "the result is no longer the natural and probable consequence of the primary cause or one which ought to have been anticipated." *Love v. Deere & Company,* 684 S.W.2d 70, 75 (Mo.App.1985). If the purported intervening cause occurs in combination or concurrent with earlier negligence, it is not an intervening cause. *Buchholz v. Mosby–Year Book, Inc.,* 969 S.W.2d 860, 862 (Mo.App.1998); *Buck v. Union Electric Company,* 887 S.W.2d 430, 434 (Mo.App.1994).

■■■■ Viewing the facts in a light most favorable to the Collinses, we conclude that Wake–Larison's negligence was not an intervening cause. The lawyers involved in the case before her involvement had negligently advised the Collinses that they could revoke their consent at any time before the adoption was final. This advice played a significant role in convincing the Collinses to consent to the adoption and set in motion the ultimate outcome. Any injury caused by Wake–Larison was no different than what would have occurred had she never been involved in the case. As soon as the Collinses executed their consent based on Anderson's and Krigel's negligent advice, they stood to lose custody of their child. Losing custody was the natural and probable consequence of the lawyers' negligently advising the Collinses that they could withdraw their consent at any time before the adoption was final. Although Wake–Larison intervened, her negligence did not interrupt the chain of events set in motion by the negligent advice of the lawyers before her. Wake–Larison's intervening negligence did not create a new injury or unexpected result. It simply added another plank to a raft already afloat.

The lawyers assert that Wake–Larison's failure to repair the damage caused by their negligent advice constituted an intervening cause. We disagree. An intervening attempt to fix a mistake caused by an earlier party is not necessarily an inter-

vening cause, even when the attempted fix fails.

This court reached the same conclusion in *Love*, 684 S.W.2d at 75. In that case, a farmer sued a combine manufacturer after a safety shield broke and exposed the machine's gears and pulleys. The farmer's hand was cut off when he attempted to repair the guard. The manufacturer argued that the farmer's attempted repair was an intervening cause that cut off its liability. The *Love* court disagreed: "The unsuccessful reattachment of the shield by [the farmer] did not interrupt the chain of events caused originally by the product defect and, thus, could not be an event of intervening proximate causation." *Id.* at 75.

■ Similarly, the Collinses received negligent advice, and Wake–Larison attempted to fix the mistake by filing a motion to revoke the Collinses' consents. Wake–Larison's attempted fix failed, but, assuming that she acted negligently, her negligence did not interrupt the chain of events triggered by Krigel's and Anderson's alleged negligence.

This conclusion is bolstered by the foreseeability of the Collinses' hiring another attorney to attempt to fix their previous attorneys' mistakes. An intervening cause is not foreseeable. *See, e.g., Shannon v. Wal–Mart Stores, Inc.*, 974 S.W.2d 588, 591 (Mo.App.1998); *Oberkramer v. City of Ellisville*, 650 S.W.2d 286, 298 (Mo.App. 1983). A reasonable person would foresee that a person that he injured would seek a physician's care. In the same way, that the Collinses would seek additional legal advice after receiving negligent advice from Krigel and Anderson was foreseeable.

That Wake–Larison's negligence was an intervening cause cutting off Krigel's and Anderson's liability, therefore, was not a sound basis for the circuit court's sum-

mary judgment. The question remains whether or not Krigel and Anderson caused the Collinses' injury. If the Collinses did not present facts from which a jury could have concluded that Krigel and Anderson caused the Collinses' injury, the circuit court's summary judgment was proper and should be affirmed.

■ Viewing the evidence in a light most favorable to the Collinses, we discern unresolved, genuine issues of material fact as to the causation issue. The Collinses countered the lawyers' denials that they had misled the Collinses with bad legal advice by submitting affidavits that asserted that Krigel and Anderson had advised them that their consents could be withdrawn at any time before the adoption was final and that they relied on this advice. This created a fact issue to be determined by the fact finder and rendered summary judgment inappropriate.

■ The lawyers defend the circuit court's summary judgment by asserting that the Collinses should be estopped under the doctrine of judicial estoppel from making the allegations that they aver in this action because they swore to the circuit court in a hearing on December 12, 1995, that they consented to the adoption. The Collinses testified in that hearing that they "fully understood the consequence of their decision and … voluntarily agreed to the adoption." *D.C.C. I,* 935 S.W.2d 657, 659 (Mo.App.1996). "[A] person who states facts under oath, during the course of a trial, is estopped to deny such facts in a second suit…." *Bellinger v. Boatmen's National Bank of St. Louis,* 779 S.W.2d 647, 650 (Mo.App.1989).

■ This doctrine does not apply in this case. The Collinses' averments do not contradict their testimony before the circuit court. At the hearing, the Collinses did

consent to the adoption, but, according to their allegations, their consent was based on a mistaken belief that they could withdraw their consent later should they change their minds. Indeed, when Anderson asked the Collinses about their consent during the December 12 proceeding, he couched his questions in terms of the circuit court's subsequent approval of the adoption.

■ The lawyers also raise a related doctrine, collateral estoppel. Under this doctrine, the courts prohibit a party from litigating an issue that he has previously litigated and lost. This doctrine also does not apply to this lawsuit. The issue of whether or not Krigel and Anderson negligently advised the Collinses that they should consent to the adoption because they could withdraw their consent later has never been litigated. In this case, the Collinses are claiming legal malpractice and breach of fiduciary duty. The issue of whether they consented voluntarily to the adoption is separate from whether or not they were misled or given negligent advice by their attorneys. Because the issue of attorney malfeasance has yet to be determined, issue preclusion does not apply, and the circuit court's summary judgment cannot be defended on this ground.

Anderson asserts that collateral estoppel bars the Collinses from relitigating the issue of whether or not the Indian Child Welfare Act (ICWA) applies. The Collinses aver that Anderson negligently misrepresented to Chandrika Collins that she should remove all indication of her Native American heritage from her profile. We need not address the issue because the Collinses' claim for negligent misrepresentation against Anderson does not depend on whether or not the ICWA applies; it stems from Anderson's advice that Chandrika not reveal that she was of Native American descent. Collateral estoppel does not apply.

■ Anderson further asserts that the circuit court's summary judgment was proper concerning the Collinses' claim against him for negligent misrepresentation because the Collinses would not be able to establish the requisite elements. In asserting their claim, the Collinses alleged that Anderson advised them that they could revoke their consent to the adoption at any time and that this advice was false. The Collinses averred that they relied on this advice in consenting to the adoption.

■ The elements of negligent misrepresentation are (1) the speaker supplied information in the course of his or her business because of some pecuniary interest, (2) that was false, (3) without exercising reasonable care or competence in obtaining or communicating this information, (4) for the guidance of a limited group of persons in a particular business transaction, (5) and the listener justifiably relied on the information, (6) and, as a result, suffered a pecuniary loss. *M and H Enterprises v. Tri–State Delta Chemicals, Inc.*, 35 S.W.3d 899, 904 (Mo.App.2001). "A negligent misrepresentation claim is premised upon the theory that the speaker believed that the information supplied was correct, but was negligent in so believing." *Colgan v. Washington Realty Company*, 879 S.W.2d 686, 689 (Mo.App.1994). If the fact finder deems the facts as averred by the Collinses to be true, they state a claim of negligent misrepresentation.

The lawyers next defend the circuit court's summary judgment on the ground that the Collinses settled their dispute with the Standens rather than pursue their remedy at law. This court remanded *D.C.C. II* to circuit court to consider the Collinses' claim against the Standens that their consent to the adoption should be set

aside on the ground that it was obtained fraudulently. Rather than litigate the claim on remand, the Collinses entered into a settlement agreement with the Standens. The lawyers argue that, by settling rather than litigating their fraud claim, the Collinses abandoned their right to challenge the validity of their consent. We disagree.

 Settlements do not necessarily preclude damage claims. *Williams v. Preman,* 911 S.W.2d 288 (Mo.App.1995), *overruled on other grounds by Klemme v. Best,* 941 S.W.2d 493 (Mo. banc 1997). Public policy favors settlements, and malpractice victims should not be "completely precluded from ... settling ... underlying claim[s]," particularly when the plaintiff can show that settlement was justified. *Id.* at 298.

 In this case, as was the case in *Williams,* the Collinses made "a bona fide attempt ... to mitigate their damages and bring the litigation to an end" by settling with the adoptive parents. *Id.* They had battled their claim for several years to regain custody of their son. Their expert, the Honorable Frank D. Connett, Jr., testified that, in his opinion, the Collinses would have been able to show fraud and misrepresentation without regaining custody of their child because of the difficulty of showing that removing the child from the Standens' custody was in the child's best interest. Because of that opinion, the Collinses settled with the Standens by agreeing that the Collinses would enjoy joint legal custody and visitation rights. The Collinses were not obligated to risk losing all rights to the child by litigating their claim simply because their attorneys were negligent. They chose to mitigate their damages.

The lawyers rely on *Williams v. Bryan, Cave, McPheeters, McRoberts,* 774 S.W.2d 847 (Mo.App.1989), for the proposition that a party cannot sue his or her attorney for malpractice when the party has a complete and adequate remedy available. They contend that, because the Collinses could have won the lawsuit against the Standens, they had a complete and adequate remedy available. *Williams,* however, does not aid the lawyers. In *Williams,* the plaintiffs had filed a separate will contest, which was pending while the case was on appeal. *Id.* at 848 n. 1. Thus, the dispositive issue in the malpractice case—whether or not the attorney had erred in superseding one will with another—was not only pending below, but also would have required the court to "offend the probate code by requiring the trial court in the tort action to accept one document as testatrix's valid will and to reject another document as not her will." *Id.* at 848. The facts of *Williams* are a far cry from those in this case.

 The lawyers next contend that summary judgment was proper because the Collinses' settlement rendered their malpractice damages too conjectural and speculative, and damages must be proven to establish a claim of legal malpractice. *Rodgers v. Czamanske,* 862 S.W.2d 453, 458 (Mo.App.1993). "[D]amages need not be established with absolute certainty, but reasonable certainty is still required as to both existence and amount and the evidence must not leave the matter to speculation." *Aluminum Products Enterprises, Inc. v. Fuhrmann Tooling & Manufacturing Company,* 758 S.W.2d 119, 121 (Mo. App.1988) (quotation omitted).

 Although a settlement of an underlying lawsuit injects some speculation into a claim for attorney malpractice, it does not preclude a plaintiff from proving malpractice so long as the plaintiff can establish a causal link between the alleged negligence and any loss incurred. *See*

*Williams v. Preman,* 911 S.W.2d 288, 298 (Mo.App.1995). The plaintiff's obligation is to "prove that the settlement was necessary to mitigate ... damages," *id.,* or "that plaintiff was driven to the necessity of settling because, if the case had not been settled, plaintiff would have been worse off." *Id.* at 300.

■■■ Concerning a remedy in this case, we are mindful of the issues concerning the difficulty of crafting the proper remedy raised in the concurring opinion. We are confident, however, that the circuit court on remand will be able to sift through these issues, as difficult as that might be, to effectuate the proper remedy.

The Collinses, through Judge Connett's testimony, established sufficient justification to have survived the attorneys' motion for summary judgment. Judge Connett, who had 30 year's experience with juvenile issues, "specifically predicted that [the Collinses] would have lost [had] the underlying claim ... not been settled." *Id.* at 300.

■■■ Krigel and his firm assert that summary judgment was appropriate for the claims against them because the Collinses did not present evidence establishing that Krigel acted as the Collinses' attorney. An attorney-client relationship exists when a person seeks and receives legal advice and assistance from a lawyer who intends to give legal advice and assistance to the person. *Donahue v. Shughart, Thomson & Kilroy,* 900 S.W.2d 624, 626 (Mo. banc 1995). But "reliance alone upon the advice or conduct of a lawyer does not create an attorney-client relationship." *Id.*

■■■ When the evidence is viewed in the light most favorable to the Collinses, ample evidence supports the Collinses' contention that Krigel acted as their attorney and provided them with legal advice.

Totaro, the Standens' attorney, told the Collinses that Krigel was serving as their attorney at the Standens' expense. Chandrika Collins testified that she telephoned Krigel and, during their conversation, received legal advice from him. This was sufficient to put into issue whether or not an attorney-client relationship existed. Summary judgment, therefore, was improper on this ground.

For these reasons, the circuit court erred in granting summary judgment for the attorneys. We, therefore, reverse the circuit court's judgment and remand for further proceedings.

EDWIN H. SMITH, Presiding Judge, concurs.

JAMES M. SMART, JR., Judge, concurs in separate opinion.

JAMES M. SMART, Jr., Judge, concurring.

I concur in the analysis of the majority opinion as far as the particular issues addressed therein. I also concur because I believe the case must be remanded in view of the fact that a portion of the damages alleged are potentially recoverable if the case is proven. I write separately, however, because of concerns related to the damage claims.

In Plaintiffs' petition, they recite the following as far as the damages they seek:

157. As a direct and proximate result of Defendants' negligence as set forth herein, Defendants caused Plaintiffs to lose the physical custody of their son, Chase.

158. In addition, as a direct and proximate result of Defendants' negligence as set forth herein, Plaintiffs were caused to suffer and continue to suffer great emotional pain and suffering and mental anguish over the loss [of] the

custody of their son, and have, since December 1995 to the present, been deprived of, and will in the future be deprived of, Chase's sole and undivided love, affection, and companionship.

159. Further, as a direct and proximate result of Defendants' negligence as set forth herein, Plaintiffs have been caused to expend substantial amounts of money in attempting to obtain the return of their son, including attorneys' fees and costs.

160. Further, as a direct and proximate result of Defendants' negligence, Plaintiffs will incur expenses for numerous other related expenses including, but not limited to, professional counseling.

Plaintiffs' prayer for damages seeks, *inter alia*, recovery for the loss, since December 1995, of the child's "sole and undivided love, affection and companionship."

This is, as far as I have been able to discern, a case of first impression in Missouri as to whether law and policy will permit the recovery of monetary damages for negligent interference with relationship rights as to a *living* child.[1] This is not a case of abduction or other deliberate interference with relationship rights. Also, it is not a wrongful death case in which the legislature has specified that a jury may evaluate the loss of companionship and services of a child who is now deceased. To the extent plaintiffs seek damages for interference with the "sole and undivided love, affection and companionship" of the living nine-year-old child, the case will tend to place that child's interests squarely in the crucible of litigation over monetary compensation for the child's affections. If I understand pertinent law and policy considerations correctly, there is substantial doubt about whether plaintiffs should be permitted to seek recovery for these injuries.

It is difficult to find any cases in which a jury has been allowed to adjudicate the value of the loss, through negligence, of a parent's physical custody and relationship rights with regard to a living child. But see *Person v. Behnke*, 242 Ill.App.3d 933, 183 Ill.Dec. 702, 611 N.E.2d 1350 (1993) (dismissal of legal malpractice action reversed where court held that a claim exists for non-economic damages resulting from a plaintiff's loss of custody and visitation of his children in a divorce proceeding; holding limited to the most egregious cases of legal malpractice).[2]

This is not a case about the kind of deliberate interference with custody rights that might justify criminal as well as civil penalties.[3] This case is more complicated

---

1. In reviewing a grant of summary judgment, the court is to affirm on any ground consistent with law, whether the trial court relied upon that ground or other grounds. *See Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 243–44 (Mo. banc 1984). Therefore, if this issue related to damages were not an issue of first impression, or if the parties had addressed it in briefs, this court might choose to address the issue of partial summary judgment as to damages. Not having the benefit of such briefing or clear legal guidelines, however, this writer chooses merely to raise the concerns so that the parties may address the issues in the trial court if they wish to do so.

2. The court in *Behnke* relied on the fact that the Illinois wrongful death statute allows recovery for the loss of society of a child. 611 N.E.2d at 1353–55. While the *Behnke* court acknowledged that damages for the parent's mental distress would not be recoverable, it did allow non-economic damages, holding that the claim for loss of custody and visitation did not constitute a claim for mental distress. *Id.* at 1353.

3. It has been suggested that a parent should be entitled to tort compensation for emotional distress in the case of an abduction of the child, or in the case of a conspiracy to alienate the child's affections, or in the case of defaming the parent by stating to the child

for the child in question in that it asks the fact finder to place an economic value on parental rights to the exclusive care of the child and the loss of exclusive society with that child (who is legally shared with another set of custodians).

Is it not true, under the plaintiffs' theory of damages, that the more alienated from plaintiffs that the child is at the time of trial, the more money they should receive in compensation? Does that fact not put in front of the plaintiffs an unhealthy temptation to make sure they maintain a substantial distance in their relationship to the child? What pressures are placed on the child by that and other factors?

At common law, a parent traditionally had no cause of action for non-economic damages, such as emotional distress and loss of society as to his or her child, due to legal negligence. A parent also had no common law action for alienation of the affections of a child, whether a minor or an adult. *See* 59 Am.Jur.2d *Parent and Child* § 92 (1987). *See also* Restatement (Second) of Torts, § 699. While parental rights are sacred rights, there always have been, and there always will be, sound reasons to avoid the intrusive judicial intervention in the life of the child and of the family that would be necessitated in such an action as this. Does not life itself have some adjustment mechanisms that can be utilized to allow nature to take its course when litigation does not distort attitudes and motives?

Is there a way for a jury to determine the value of the loss of parental rights and responsibilities in this scenario without making the child himself the primary focus of the proceeding? Is there a way that does not involve causing the child and the child's affections to be evaluated like a chattel to be owned? A legal negligence

action against a family law practitioner for negligence in handling a custody dispute in a marital dissolution presents a number of problems, including damages. *See generally* James L. Rigelhaupt, Jr., J.D., Annotation, *Attorney's Liability for Negligence in Cases Involving Domestic Relations,* 78 A.L.R.3d 255, [*3] (1977); *Behnke,* 611 N.E.2d 1350; *Ignotov v. Reiter,* 425 Mich. 391, 390 N.W.2d 614 (1986). As already mentioned, there is also the pressure such a suit would place on the child by affecting the way the divorced parents relate to the child.

Section 453.110, RSMo 2000, which prohibits the permanent transfer of custody of a child without court order, has an "obvious purpose" of opposing the "concept that a parent could pass children on like chattel to a new owner." *In re Baby Girl ——,* 850 S.W.2d 64, 68 (Mo. banc 1993). Section 453.075 requires a full accounting of any amounts spent in relation to the adoption of a child. The statute provides that only certain types of expenses may be reimbursed by the adoptive parents; and, of course, no other money or other consideration may be paid by or on behalf of the adoptive parents. *See* § 453.075.2, RSMo 2000. Section 568.175 also creates the crime of "trafficking in children." It prohibits giving, offering, receiving, or soliciting any money or other consideration for the delivery of a child for the purpose of adoption. *See* § 568.175, RSMo 2000. Missouri is thus very solicitous of the notion that children are not chattels to be bartered or sold.

Parental rights are not for sale. Had the Standens purchased a negotiated peace in the earlier litigation by agreeing to pay the plaintiffs money to settle and abandon their claim to set aside their termination consents, such agreement would be void

that the parent was insane. *See* 59 Am.Jur 2d

*Parent and Child* § 92 (1987).

and unenforceable. *See* § 453.075.2. Because of the same underlying concerns, there is risk involved in allowing compensation to be adjudicated for a professional's negligent interference with such rights. Perhaps such an assertion sounds harsh and unfeeling toward the biological parents. However, it seems obvious that any attempt to provide monetary compensation in such a case requires extensive and intrusive court intervention into family life and into the life of the nine-year-old child, including his feelings, his likes and dislikes, and the actions of both sets of parents. While the court may have appointed a guardian ad litem for the child's benefit, it is extremely unlikely, in my view, that such a guardian ad litem can provide significant protection for the child in the midst of such powerful factors.

The courts have recognized the "sanctity of the parent-child relationship" in termination of rights cases. *In re K.L.S.*, 119 S.W.3d 548, 551 (Mo.App.2003). The State's power to terminate rights is an "awesome power." *Id.* Assuming, as we do for purposes of our review, that here things happened as Plaintiffs say they did, the loss could be considered huge. At the same time, the case is not about the child being a piece of property to be owned. To make the child a chattel at this point in our search for accountability has too great a potential to distort the child's relationships and damage his welfare.