Gali **BHAGVANDOSS,**
**Plaintiff-Respondent,**

v.

**BEIERSDORF, INC.,**
**Defendant-Appellant.**

No. 68306.

Supreme Court of Missouri,
En Banc.

Jan. 13, 1987.

Rehearing Denied Feb. 17, 1987.

David Klingsberg, Maris Veidemanis, New York City, Hamp Ford, Columbia, for defendant-appellant.

Robert C. Smith, Bruce H. Beckett, Gena J. Trueblood, Columbia, Elwood L. Thomas, Kansas City, for plaintiff-respondent.

BLACKMAR, Judge.

The plaintiff, while riding his bicycle on June 24, 1978, was severely injured in a collision with an automobile. His condition was aggravated by an infection which developed following his initial surgery. He filed suit against the motorist for negligence, and against appellant Beiersdorf, Inc., the manufacturer of a non-sterile compression-type bandage, in a product liability claim, asserting that the bandage was contaminated by a microorganism which caused the infection. The jury found in favor of the defendant motorist, but returned a verdict against the appellant for actual and punitive damages. The Court of Appeals, Western District, affirmed and we granted transfer. We take the case as on initial appeal and affirm the award of actual damages while reversing the award of punitive damages. We hold: (1) that the trial court acted within its discretion in overruling the appellant's motion for severance or separate trial; (2) that there was an issue for the jury on the plaintiff's product liability claim for actual damages; and (3) that the evidence, taken most strongly from the plaintiff's standpoint, does not support the award of punitive damages.

### 1. The Facts

Eight days after the defendant was admitted to the University of Missouri Medical Center his neurological condition changed, requiring extensive back surgery and bone grafts, performed July 3, 1978. The surgical wound was closed after the operative procedures were completed, and the wound was dressed with an adeptic bandage covered with petroleum jelly, 4x4 gauze pads, and an absorbent ABD bandage. All of these dressings were sterile. The sterile dressings were held in place by an Elastoplast bandage, manufactured by the appellant. Elastoplast is the appellant's trade name for an adhesive compression-type bandage, having a special property of elasticity allowing flexation of the body in the wound area. It is not a sterile product and is not sold as such.

The plaintiff's wound dressing was removed three days after surgery and a new dressing was applied, without the use of Elastoplast. The next day blisters were noticed on his back at the site of the marks left by the adhesive from the Elastoplast bandage. The blisters persisted and led to the death of skin, requiring extensive and very painful debridement procedures. As a result of the postoperative infection the plaintiff's hospital stay was prolonged by as much as two weeks. He suffered considerable pain and suffering, severe and permanent scarring, and other damages. An organism known as *rhizopus* was found to be present and was established by evidence as the causative agent in the infection.

Rhizopus is widespread in the environment, in various strains. It exists princi-

pally in the form of spores, which are normally dormant and may remain so for long periods of time. The spores will grow under proper conditions of temperature, moisture and nutrition. One of the plaintiff's witnesses testified that the organism does not usually cause infection in human beings but that it may do so, especially if it exists in abnormal concentrations or gains access to a person in a weakened condition.

In October of 1977 the appellant received reports through the Food and Drug Administration of several cases of rhizopus infection following surgery at the Mayo Clinic in which Elastoplast had been used to hold the dressings on. The appellant then cultured samples of the product in its warehouse, and rhizopus was found to be present in some of the samples. An independent laboratory confirmed the finding.[1] During the next several months the appellant received reports from several locations of the presence of rhizopus in its product or of rhizopus infection in patients whose sterile dressings had been covered by Elastoplast. These reports of the presence of the organism were introduced into evidence without explanatory testimony, and were received over objection only as evidence of notice and not as evidence of the facts stated. The plaintiff offered no further evidence to show that the product had actually caused rhizopus infection, in any of the cases previously reported.

The Food and Drug Administration (FDA) was aware of the reports just described. The Center for Disease Control, a branch of the FDA, publishes a "Morbidity and Mortality Weekly Report," (MMWR) which is circulated among hospitals and other health care providers, and is routinely read at UMMC. A circularization in February of 1978, reporting the Mayo Clinic incident, was noticed by the chairman of UMMC's infection control committee. A culture of samples of the Elastoplast then in stock at UMMC was made. Several microorganisms were found, but no rhizopus infestation.

When the first reports of the presence of rhizopus came to the appellant's attention, its quality control director quarantined one serial of the product. Production of Elastoplast was discontinued from September 1977 through February 1978 due to reconstruction in the plant. In February of 1978 the director placed a hold on all lots of the product then in stock. This hold was removed by direction of the appellant's president and the product in the warehouse was released for sale.

On March 8, 1978, the appellant sent a circular letter to customers and users, responding to the February MMWR. The plaintiff characterizes this letter as a "sales circular" and claims that it did not set out the full information then in appellant's possession. It contained statements as follows:

Elastoplast is a compression bandage which should not be used over open wounds and should not come in contact with sterile fields if the maintenance of sterility is vital.

ELASTOPLAST IS A SAFE COMPRESSION DEVICE BUT IS OBVIOUSLY NOT RECOMMENDED FOR STERILE INTENSIVE PROCEDURES.

This letter also came to the attention of the chairman of UMMC's infection control committee. It was reported to the hospital staff, but the physicians connected with plaintiff's surgery had no recollection of having seen it. The appellant made no other general report to customers during the period here in issue.

FDA instituted an investigation and inspection in October of 1977. It issued no order, directive or suggestion for the recall of the product at any time. Its agents spoke with defendant's officers and conducted inspections at the plant site. There is no evidence that anything was found which shed light on the appearance of rhizopus in the product. FDA suggested that, for the product still in the appellant's hands, cartons be marked with the legend, "Not Sterile. Do not use over open

---

1. The certificate of American Biological Control Laboratories covered samples from seven lots of Elastoplast. Rhizopus was present in five samples and aspergillus in six.

wound." The evidence does not show whether the cartons sold to UMMC were marked in this way, but the point is not particularly significant because the hospital already had the essential information.

The evidence supported a finding that, prior to March 8, 1978, Elastoplast was regularly used in surgery such as the plaintiff's, to hold sterile dressings in place over surgical wounds. The appellant's advertising indicated that this use was appropriate. The appellant's president testified, however, that such a use was not proper, because there was an open wound. This same position was taken by appellant's counsel in argument before this Court. As an example of a use deemed appropriate, counsel mentioned the taping of rib injuries and fixation of casts.

### 2. Failure to Sever

The appellant argues that the court abused its discretion in overruling motions for severance or separate trial, so that the cases against the two defendants were tried together. It complains that the jury was told about the plaintiff's very serious injuries, only a portion of which could possibly be attributable to the appellant, and that the case against the motorist was very weak, as is shown by the verdict in his favor. It is suggested that the jury could hardly avoid the temptation to compensate the severely injured plaintiff for more than the appellant's proper share of liability.

We reject the point. The policy of the law is to try all issues arising out of the same occurrence or series of occurrences together. *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983); *Bitting v. Adolf,* 704 S.W.2d 671 (Mo. banc 1986). Whether there was a severance or not the jury would certainly know that the plaintiff had sustained grievous injuries which could not be attributed to the appellant. There was a clear delineation in the evidence of the additional damage caused by the infection. There was no abuse of discretion in trying all issues in a single trial, under appropriate instructions indicating the extent of the

defendant's liability. The jury is able to make the appropriate finding indicated by these instructions. The trial judge apparently did not consider the verdict to be contrary to the weight of the evidence, and we see no reason to reverse for failure to sever.

### 3. Liability for Actual Damages

The elements of a product liability claim are set out in *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362 (Mo. 1969), following Section 402A of the Restatement (Second) of Torts (1965). The plaintiff's verdict directing instruction reads as follows:

### INSTRUCTION NO. 13

Your verdict must be for plaintiff Gali Bhagvandoss against defendant Beiersdorf, Inc. if you believe:

First, defendant Beiersdorf, Inc. sold the Elastoplast bandage in the course of defendant Beiersdorf, Inc.'s business, and

Second, the Elastoplast bandage was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Third, the Elastoplast bandage was used in a manner reasonably anticipated, and

Fourth, plaintiff Gali Bhagvandoss was damaged as a direct result of such defective condition as existed when the Elastoplast bandage was sold.

The appellant argues that the plaintiff failed to show that the Elastoplast used to fasten the plaintiff's dressing was in a "defective condition unreasonably dangerous," that the product was not put to a reasonably anticipated use, and that there is no substantial evidence of causation. We believe that the proof on all elements is sufficient for the jury.

It cannot be said that the product was unsuitable for the use intended by the manufacturer simply because it contained the spores of rhizopus. The product was not a sterile product and was not sold as sterile.

The doctors and nurses who used the product to fasten the plaintiff's dressings knew that it was not sterile. Rhizopus is a common organism, found in many places. It rarely causes problems. The rolls of Elastoplast tested by UMMC in 1978 were free of rhizopus, but other microorganisms were found which might cause harm under certain conditions. The rolls were not discarded or returned for that reason. Users of a non-sterile product have no reason to expect that that product will be free from microorganisms. The expectation, rather, is to the contrary, and users must so assume. The outer layer of any dressing, necessarily, cannot be sterile. If it is sterile when applied, it does not remain so for long. There is no expert testimony indicating that the product was so unsuitable that it should be taken off the market or recalled.

The appellant frankly admits, however, the Elastoplast was not suitable for use to hold dressings over a surgical wound such as plaintiff had. The hospital characterized the situation as one involving an "increased susceptibility to infection." The jury could find that this characterization is equivalent to the "sterile intense procedures" mentioned in the appellant's circular letter of March 8, 1978.

■ The next question is whether the use of the product here in issue was a use reasonably anticipated by the appellant. The appellant argues that the March 8 letter was sufficient to warn users that a use of this kind was not appropriate. We conclude that the jury could find that the letter is not clear enough to warn hospital personnel that one method of use which had been common in the past should no longer be made.[2] The reference to "open wound" might be thought to give a clear sign. It is unreasonable to assume that the defendant was suggesting that a tape product would ever be applied directly over a wound. Even a layman can imagine the pain. The jury might not be satisfied, however, that the letter made sufficiently clear to users that the product should not properly be used to fix sterile dressings over open surgical wounds, as it had commonly been used in the past. A product may be unreasonably dangerous and defective even though it would not have caused injury when used properly, if the actual use is one reasonably anticipated by the manufacturer. *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo. banc 1986).

■ The evidence of causation is by no means conclusive, but we find it sufficient for the jury. *Cf. Kehm v. Procter & Gamble Manufacturing Co.*, 724 F.2d 613 (8th Cir.1983). The presence of rhizopus on rolls of Elastoplast was demonstrated on two occasions at the defendant's plant, and on several occasions in the field. Even though there was no evidence that other uses of Elastoplast had actually caused infection,[3] the jury might find that, because of reports of the presence of this particular organism, the defendant found it appropriate to warn users that certain uses which were common in the past should no longer be made. The jury could also find that the use of the product in the manner here shown introduced an unreasonable risk of rhizopus infection. Additionally, the jury could determine from the evidence that the infection was discovered at the site of the marks left by the adhesive from the Elastoplast bandage. If this is so, there is a basis for liability even though the seepage of drainage through the sterile layers, or the plaintiff's special susceptibility, may have been contributing causes. The result was what the appellant anticipated if the product is used to fix dressings over a surgical wound in a sterile intense situation.

---

**2.** One of the plaintiff's experts, when asked about the use of Elastoplast in covering the plaintiff's operative wound, replied:

I can only answer that to me at least it doesn't seem like a good idea, but it's been done that way for years.

**3.** The plaintiff's evidence on the reports of presence of the organism, or infection following its use, were received only as evidence of notice, and not as proof of the truth of the facts stated or of the cause of any resulting infection.

### 4. Punitive Damages

Punitive damages were submitted by means of Instruction No. 15, based on MAI 10.04, and reading as follows:

> If you find in favor of plaintiff Gali Bhagvandoss under Instruction No. 13 and if you believe:
>
> First, at the time defendant Beiersdorf, Inc. sold the Elastoplast bandage, defendant Beiersdorf, Inc. knew of the defective condition and danger submitted in Instruction No. 13, and
>
> Second, defendant Beiersdorf, Inc. thereby showed complete indifference to or conscious disregard for the safety of others, then in addition to any damages to which you find plaintiff Gali Bhagvandoss entitled under Instruction No. 14, you may award plaintiff Gali Bhagvandoss an additional amount as punitive damages in such sum as you believe will serve to punish defendant Beiersdorf, Inc. and to deter defendant Beiersdorf, Inc. and others from like conduct.

This instruction is based on *Racer v. Utterman*, 629 S.W.2d 387 (Mo.App.1981), appeal dismissed, *cert. denied* 459 U.S. 803, 103 S.Ct. 26, 74 L.Ed.2d 42 (1982), one of two Missouri cases finding that the evidence justified the submission of punitive damages in a products liability case.[4] There the jury could have found that the defendant manufactured a sterile operative shield, which it knew to be highly flammable, and failed to warn users of flammability. That case applied a test of "complete indifference to or conscious disregard for the safety of others." The court did not affirm a judgment for punitive damages but rather remanded the case because the instruction did not submit the issues of the defendant's knowledge of the defect. The instruction quoted above is designed to correct the fault found in *Racer*.

The plaintiff argues that the appellant had adequate notice of rhizopus "contam-

ination" in its product, both in the field and in lots held in its warehouse. It is further argued that the appellant did not share information with its customers, but rather sought to mislead them by means of the letter of March 8, 1978, which he styles a "sales promotion," rather than a warning. It is also submitted that the appellant received later information about the presence of rhizopus in the product and did not share this information with its customers.

■ The test for punitive damages in a product liability case is a strict one. In numerous cases awards of punitive damages have been set aside.[5] *Warnes v. Southwestern Bell Telephone Company*, 428 S.W.2d 596, 603 (Mo.1968) suggests that punitive damages may not be awarded even for exaggerated negligence. This case was not a products liability action, but similar considerations apply. Restatement (Second) of Torts § 908(1) Comment b (1979), suggests that there must be "some element of outrage to justify punitive damages." Also of interest is our recent opinion in *Hoover Dairy Co. v. Mid-America Dairymen*, 700 S.W.2d 426 (Mo. banc 1985), involving negligence in the performance of a contract, which makes it clear that neither inadvertence nor bungling can be equated to "complete indifference."

■ Tested by this high standard, we conclude that punitive damages were not properly submitted. In so holding we of course accept the plaintiff's evidence as true, and give the plaintiff the benefit of all reasonable inferences from the evidence.

The plaintiff argues that the product was "contaminated" by the presence of rhizopus. But plaintiff's evidence uniformly shows that this organism is very widespread, and is commonly present in hospitals. The organism is the kind of thing that might be expected to be present in a product which is not sterile. The jury was

---

4. See also, *Rinker v. Ford Motor Co.*, 567 S.W.2d 655 (Mo.App.1978).

5. See e.g., *Groppel Company, Inc. v. United States Gypsum Company*, 616 S.W.2d 49 (Mo. App.1981); *Love v. Deere and Co.*, 684 S.W.2d 70 (Mo.App.1985); *Laney v. Coleman Co., Inc.*, 758 F.2d 1299 (1985); *Roth v. Black & Decker, U.S. Inc.*, 737 F.2d 779 (8th Cir.1984); *Ferren v. Richards Manufacturing Company*, 733 F.2d 526 (8th Cir.1984) (all cases applying Missouri law).

required to find under Instruction No. 15 that the defendant knew of the product's defective condition at the time it was sold. The claim the defendant knew of the product's "contamination" simply has not been established. It cannot be said that the appellant was guilty of "complete indifference" or "conscious disregard of the rights of others" in not recalling the product simply because of the initial reports and the presence of the organism in the warehouse supplies.

It is also argued that the evidence shows that the product was "contaminated with rhizopus fungi to an unusual extent," and that there was "a higher than normal concentration of rhizopus fungi." The evidence does not support these claims. The evidence of rhizopus infection is entirely unquantified. There is no showing of the concentration involved in any particular instance, or of the number of lots in which the organism was found compared to the total number of lots produced. Much less is there evidence that the defendant knew of any abnormal concentration.

Nor is the March 8, 1978 letter probative of "complete indifference" or "conscious disregard of the rights of others." The letter sought to warn users that the product should not be used in sterile intensive procedures. We have held that the jury might well find that the letter did not give sufficient warning that the product should not be used for dressing surgical wounds such as the plaintiff sustained. But inadequate communication cannot be equated to conscious disregard.[6] The appellant quite properly took issue with the description of the product as a "wound dressing," and was entitled to question the accuracy of other statements in the report. Nor is the mere fact that the appellant continued to market the product of particular significance, in the absence of either an official or an expert suggestion that it should not do so. No expert witness even intimated that the appellant should cease sales, or should recall supplies in the field.[7]

The evidence does not meet the standard of *Rinker v. Ford Motor Company*, 567 S.W.2d 655 (Mo.App.1978). There the evidence showed that the manufacturer had prior notice of 29 instances in which the fast idle cam of an automobile had broken, and that the manufacturer knew that a broken fast idle cam could cause the throttle to jam open. The court held that this knowledge, and the manufacturer's total inaction following receiving knowledge, supported a finding of "complete indifference to or conscious disregard to the safety of others." *Rinker*, 567 S.W.2d at 667–68. Here the defendant gave serious attention to the problem and issued a warning. Even if there are grounds for criticizing its procedures, the finding of complete indifference is not supported by the record.

Careful examination of the cases cited by Judge Billings in his partial dissent[8] does not change our conclusion. In each, a drug manufacturer had in its files a substantial history of severe side effects, and the evidence supported a finding of failure to warn about the particular effects suffered by the plaintiff. There was evidence of indifference which is not present here.

We do not question the cases holding that a manufacturer may not shed its responsibility by hiding behind a regulatory agency.[9] But there is no showing that the

6. *DeLuryea v. Winthrop Laboratories, etc.*, 697 F.2d 222 (8th Cir.1983); *Johnson v. Husky Industries, Inc.*, 536 F.2d 645, 651 (6th Cir.1976); *Kritser v. Beech Aircraft Corporation*, 479 F.2d 1089, 1097 (5th Cir.1973).

7. In this respect the case differs from *Mulligan v. Lederle Laboratories*, 786 F.2d 859 (8th Cir. 1986).

8. *Mulligan v. Lederle Laboratories*, 786 F.2d 859 (8th Cir.1986); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132 (3d Cir.1973); *Wooderson v. Ortho*

*Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984).

9. *Dorsey v. Honda Motor Co.*, 655 F.2d 650 (5th Cir.1981), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *Silkwood v. Kerr-McGee Corp.*, 485 F.Supp. 566 (W.D.Okla.1979) *aff'd in part, rev'd in part*, 667 F.2d 908 (10th Cir.1981), *rev'd* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).

appellant concealed anything from the FDA,[10] or failed to cooperate. Its awaiting FDA's studies before taking drastic action does not support a finding of "complete indifference" and "conscious disregard." *Cf. Kehm v. Procter & Gamble Manufacturing Co.,* 724 F.2d 613 (8th Cir.1983). This is especially so because the studies gave no complete answer or definite guidance.

The plaintiff argues that the defendant assumed an "adversarial" posture with the FDA from the time the first reports were received. This contention does not enhance the claim for punitive damages. The defendant is not precluded from challenging reports from the field, or from asking questions. Nothing in the record shows that any request by FDA was not complied with.

The judgment for actual damages is affirmed. The judgment for punitive damage is reversed. The case is remanded for the entry of a modified judgment.

HIGGINS, C.J., ROBERTSON and RENDLEN, JJ., and PUDLOWSKI, Special Judge, concur.

BILLINGS, J., concurs in part and dissents in part in separate opinion filed.

DONNELLY, J., dissents in separate opinion filed.

WELLIVER, J., not sitting.

BILLINGS, Judge, concurring in part and dissenting in part.

I dissent from the principal opinion to the extent that it declares as a matter of law that the evidence was insufficient to submit the punitive damage instruction. Defendant knew of several cases of rhizopus infection following surgery in which Elastoplast had been used and that rhizopus was present in its own stocks of Elastoplast. Despite this knowledge of the hazards to patient safety that could result from the common use of Elastoplast to fix sterile dressings over open surgical wounds, defendant failed to issue a warning which clearly cautioned against this use. Inadequate warnings can support an instruction on punitive damages. Where a warning does not clearly state the known hazards of product use, the jury should be allowed to decide whether the warning is so inadequate as to constitute complete indifference to or conscious disregard for the safety of others. *See Mulligan v. Lederle Laboratories,* 786 F.2d 859, 864–66 (8th Cir.1986); *Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132, 146 (3d Cir.1973); *Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 415–20, 681 P.2d 1038, 1060–64, *cert. denied,* 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984). Although none of these decisions is binding on this Court, their holdings on this issue comport with sound policy. A defendant should not escape liability for punitive damages simply because it issues a warning which it should realize is *inadequate* to clearly warn against the known dangers of its product.

The principal opinion states that inadequate communciation cannot be equated to conscious disregard and cites to *DeLuryea v. Winthrop Laboratories,* 697 F.2d 222, 230–31 (8th Cir.1983); *Johnson v. Husky Industries, Inc.,* 536 F.2d 645, 651 (6th Cir.1976), and *Kritser v. Beech Aircraft Corp.,* 479 F.2d 1089, 1097 (5th Cir. 1973). These decisions, however, do not state that an inadequate warning can never give rise to liability for punitive damages. Moreover, these decisions are distinguishable on their facts. In each of these cases, defendant clearly warned against the particular hazardous use or effect of its product that had caused plaintiff's injuries. The inadequacies in the warnings were in detailing the extent of the hazard or describing the necessary precautions. In this case, on the other hand, defendant's warning was inadequate both in failing to give details, and in failing to meaningfully inform Elastoplast users as to exactly what use was dangerous.

---

10. *Cf. Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2nd Cir.1967); *Toole v. Richardson-Merrell, Inc.,* 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967).

I would affirm the judgment in its entirety.

DONNELLY, Judge, dissenting.

The principal opinion removes all doubt as to where the majority has taken us. It has turned its back on individual fault as a component in the products liability equation and has embraced a "theory of social fault [which] holds society responsible for compensating society's victims through the agency of business corporations and casualty insurance companies." Wettergreen, *The Bird Court on the Law of Torts*, 2 Benchmark 131, 133 (1986). *See* Sunstein, *Naked Preferences and the Constitution*, 84 Col.L.Rev. 1689 (1984).

I must respectfully dissent. *See* Mo. Const. art. III, § 1.