In the Matter of William A. ANGOTTI,
et ux., Respondents,

v.

The CELOTEX CORPORATION,
Appellant.

No. WD 42929.

Missouri Court of Appeals,
Western District.

May 14, 1991.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 27, 1991.

As Modified July 2, 1991.

Application to Transfer Denied
Sept. 10, 1991.

David Eric Larson, Kansas City, for appellant.

Thomas A. Sweeny, Justine E. Del Muro, Kansas City, for respondents.

Before SHANGLER, P.J., and KENNEDY and FENNER, JJ.

FENNER, Judge.

Appellant, The Celotex Corporation (Celotex), appeals a jury verdict against it and in favor of respondents, William Angotti and his wife, Isabella Angotti. William Angotti's action was for personal injuries as a result of his suffering asbestosis[1] from having worked with the asbestos products of Celotex and others. Isabella Angotti's claim was for loss of consortium.

The jury awarded William Angotti the sum of $250,000 actual damages and $250,000 punitive damages. Isabella Angotti was awarded the sum of $25,000 on her claim. The trial court adjusted the verdict to reflect pre-trial settlements received by respondents from others originally named as defendants. Crediting Celotex for the amount paid in settlement, the court entered judgment against Celotex in the amount of $164,500 actual damages and $250,000 punitive damages on behalf of William Angotti, and $25,000 on behalf of Isabella Angotti.

William Angotti is a retired asbestos worker who worked with asbestos-containing products from 1948 until 1982. William Angotti's job was that of an installer of asbestos products. Within the asbestos industry his position was referred to as that of an insulator. As an insulator, Angotti applied insulation materials to objects such as pipes and boilers. Insulators worked with preformed and block insulation, asbestos cement, used to cover and as filler for cracks and joints, and asbestos paper used as a finishing product.

Celotex is the successor corporation to the Philip Carey Company (Philip Carey). Celotex does not dispute that it is liable on behalf of Philip Carey.

From 1951 through 1954 and 1958 through 1960, William Angotti worked for Kelly Asbestos, a distributor of Philip Carey products. During 1959, from 1965 to 1968, and in 1973, William Angotti worked for Central Insulation which was also a distributor of Philip Carey products. Philip Carey products were primarily used on Kelly Asbestos and Central Insulation jobs. William Angotti also worked for various other insulation contractors throughout his career, using asbestos containing products by Philip Carey and other manufacturers.

William Angotti first learned of the hazards of asbestos in 1968. He began experiencing problems of shortness of breath in 1976 and he was diagnosed with asbestosis in 1982. The evidence was that it is now known each exposure to asbestos contributes to the disease process.

The jury found William Angotti's exposure to asbestos products manufactured by Philip Carey contributed to his asbestosis. Celotex does not challenge the sufficiency

1. Asbestosis is a disease of the lungs caused by exposure to asbestos fibers.

of the evidence to support the award of actual damages.

In its first point on appeal, Celotex argues that the trial court erred in overruling its motion for a directed verdict at the close of all the evidence with respect to punitive damages. Celotex argues that the evidence failed to establish that it had actual knowledge of the dangers of exposure to asbestos during the time that William Angotti was exposed to its products. In this regard Celotex argues 1) that William Angotti was unable to state specifically which asbestos product he used during which time frames and 2) the evidence did not demonstrate actual knowledge on the part of Celotex concerning danger to insulators working with the products.

A defendant's motion for a directed verdict at the close of all the evidence is only sustainable when the plaintiff has failed to make a submissible case. *Norris v. Jones,* 687 S.W.2d 280, 281 (Mo.App.1985). In review of the trial court's ruling on a defendant's motion for directed verdict, the Court of Appeals views the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff, disregarding all evidence and inferences to the contrary. *Id.* The test to determine when a directed verdict is appropriate is whether reasonable men could differ on the correct disposition of the case. *Love v. Deere & Company,* 720 S.W.2d 786, 789 (Mo.App.1986).

The test for punitive damages in a products liability case is a strict one. *Bhagvandoss v. Beiersdorf, Inc.,* 723 S.W.2d 392, 397 (Mo. banc 1987). No Missouri case has permitted submission of a punitive damage claim in a strict products liability case on the theory that the defendant should have known of a dangerous defect in its product. See, e.g., *School District of Independence v. U.S. Gypsum Company,* 750 S.W.2d 442, 446 (Mo.App.1988); *Bhagvandoss v. Beiersdorf, Inc.,* 723 S.W.2d 392; *Love v. Deere and Co.,* 684 S.W.2d 70, 77 (Mo.App. 1985); *Sparks v. Consolidated Aluminum Co.,* 679 S.W.2d 348, 354 (Mo.App.1984); *Racer v. Utterman,* 629 S.W.2d 387, 397 (Mo.App.1981).

MAI 10.04 was adopted effective January 1, 1983, as the appropriate instruction to be given in a case where punitive damages are submissible in connection with a claim for actual damages based on strict products liability. The committee comments under MAI 10.04 reflect that it was drafted to submit the issue of punitive damages in accordance with the court's opinion in *Racer v. Utterman,* 629 S.W.2d 387.

In *Racer,* the jury was instructed at trial that it could award punitive damages upon a finding that the defendant showed complete indifference to or conscious disregard for the safety of others. On appeal the award of punitive damages was reversed and that question remanded because the punitive damage instruction did not submit the issues of the defendant's knowledge of the product defect.

MAI 10.04 now requires that the jury first find that the defendant knew of the defect and danger and secondly, that by selling the product with said knowledge, the defendant thereby showed complete indifference to or conscious disregard for the safety of others. The knowledge required within the context of MAI 10.04 is actual knowledge. *School District of Independence v. U.S. Gypsum Company,* 750 S.W.2d at 446. Missouri law does not permit submission of a punitive damage claim on a theory of constructive knowledge of a product defect. *Id.*

This is not to say that punitive damages would not be recoverable when there is evidence to show that a defendant had been put on notice of the fact that relevant information in regard to the dangerousness of a product was available to show that the product was actually known to constitute a health hazard to a given class of individuals and the defendant consciously chose to ignore the available information. However, the record in the case at bar does not warrant adoption of such a theory in this case. The record here shows that information in regard to the harmful effect of asbestos was still developing, but it does not establish that, at the relevant times herein, there was already information avail-

able to show that Philip Carey's finished products were actually known to present a health hazard to insulators. In other words, the record does not reflect that scientific knowledge even existed, at the relevant times herein, to establish legal causation sufficient to submit punitive damages against Celotex for the injuries of William Angotti as a result of his exposure, as an insulator, to Celotex's products. Without even a showing of scientific knowledge sufficient to establish legal causation, Celotex can not be held to have had actual knowledge of the danger to William Angotti on the basis of the record in this case.

William Angotti testified that he used Philip Carey products throughout his career which spanned from 1948 until 1982. More specifically, he worked for Kelly Asbestos, a distributor of Philip Carey products, from 1951 through 1954 and 1958 through 1960. In 1959, from 1965 to 1968 and in 1973, he worked for Central Insulation, another distributor of Philip Carey products. Angotti testified that when a company was a distributor for a product, the company used that product on its jobs. This testimony was sufficient to establish a time frame for Angotti's use of Philip Carey products.

The evidence relating to Celotex's knowledge of the danger of its asbestos products to those working with the product was presented by way of various correspondence entered as exhibits and the deposition testimony of John Cantlon. Cantlon was employed by Philip Carey as a consulting actuary, from the mid-forties to the summer of 1972. Cantlon acted as a management consultant in the areas of Worker's Compensation, Unemployment Compensation, Rehabilitation Compensation, Safety and Public Relations.

When the first asbestos related worker's compensation claim was made against Philip Carey in the 1950's, Cantlon told Philip Carey that this was a new problem that management would need to solve and that it would be very expensive. On September 8, 1962, Cantlon wrote a letter to Mr. L.A. Pechstein, Assistant Secretary of Philip Carey, advising that in the five year period preceding 1961, the company received ten claims based on disabilities claimed to be caused by exposure to asbestos dust.

Workers' Compensation Summary Cards in relation to five workers' compensation claims were entered in evidence for 1961 and the years preceding. One claim was disallowed. One claim was allowed for a man with asbestosis who had worked at Philip Carey as a utility man and as a helper on a corrugating machine. A claim was allowed for a man with asbestosis who worked dumping asbestos fiber onto a conveyor from a burlap bag. Another claim allowed was for asbestosis from exposure to asbestos dust by asbestos being put in beaters. The fifth claim was for asbestosis with the only other information being that the injury was from inhalation of asbestos dust over a period of time. There was no further information on any other worker's compensation claims in 1961 or before.

Cantlon testified that in his work for Philip Carey he was concerned with the plant workers who were exposed to asbestos dust in some volume as a result of their working in an environment where asbestos was produced. While there was evidence that sawing of asbestos products by insulators produced dust in varying degrees, depending on the type of material and the size of the cut, there was no evidence to show that the exposure of the plant employees with asbestosis was to the same degree as the exposure of an insulator.

There are many products and environmental conditions that are known to create a health hazard to individuals exposed to a given degree which do not create a hazard to one exposed to a lesser degree. In the case at bar, there was evidence presented that the American Conference of Governmental and Industrial Hygienists establishes exposure limits referred to as threshold limit values (TLV's). TLV's are those concentrations to which a worker can be exposed day after day over a working lifetime without adverse effects. TLV's are calculated on a time weighted average which allows for a worker to be exposed to a higher concentration for part of a day, provided that lower exposure at other

times produces an average daily exposure within acceptable limits. From 1946 to 1968, the TLV for asbestos exposure was 5 million particles per cubic foot.

The record does not show a specific exposure level to asbestos dust for plant workers as opposed to insulators in general. Nor does the record establish a level of exposure for the plant workers at Philip Carey who contracted asbestosis compared to Angotti's exposure. However, the fact that workers at the Philip Carey plant exposed to high volumes of asbestos dust within the manufacturing process contracted asbestosis does not show actual knowledge by Philip Carey that a health hazard existed from the exposure of an insulator, who did not work in the manufacturing process and within the confines of its plant, but who worked with its finished products. The evidence did not establish that Philip Carey had actual knowledge that insulators were exposed to a dangerous level of asbestos fibers by use of their products or that Philip Carey was put on notice and consciously chose to ignore information that showed its products were actually known to be harmful to insulators.

In October of 1962, Philip Carey hired Dr. Thomas Mancuso, upon the recommendation of Cantlon, to conduct a study of its manufacturing plant for one year. Dr. Mancuso was considered one of the leading experts in the field of occupational diseases. In May of 1963, Dr. Mancuso cautioned Philip Carey that it needed to develop guidelines and manuals for the benefit of consumers in regard to safe handling, ventilation and control of dust for its products. Dr. Mancuso further advised that Philip Carey should "provide technical consultation to specific users for the prevention and control of actual or projected problems relative to the use of the company's products." Advice of a need to be cautious, and a need to develop guidelines for safe handling of asbestos products is indicative of a belief that the products can be handled safely. This evidence does not establish actual knowledge of a health hazard to insulators or that information was available to show that Philip Carey's products were actually known to constitute a health hazard to insulators.

In April of 1963, Cantlon, in reference to a report by Dr. Mancuso on asbestos exposure and an article in *Industrial Health* magazine, advised Philip Carey that "[t]here is a danger ... that a condition either exists, or the fear of a condition will exist, that will effect not only your employees, but the employees of companies which purchase your products for use, and even of customers of your end products." This caution of a danger that a "condition" exists or that "fear of a condition will exist" does not equate to actual knowledge of a health hazard to insulators and does not establish that information was available to show that Philip Carey's products were actually known to constitute a health hazard to insulators.

In August of 1963, Dr. Mancuso sent Philip Carey copies of articles from medical literature relating to the "hazards of asbestos exposure in industrial employment, and to the surrounding population." Dr. Mancuso warned Philip Carey not only of its liability to employees within its manufacturing process, but also advised that "there is a possible liability to persons other than employees from air pollution." A warning of possible liability does not establish actual knowledge and it does not establish that information was available to show that Philip Carey's products were actually known to constitute a health hazard to insulators.

In October of 1963, Philip Carey decided that any further services from Dr. Mancuso should be postponed until the undertaking of corrective engineering measures and future study of Philip Carey's health problems indicate the need for his additional services. Philip Carey sought and received assurances that Dr. Mancuso's "observations of exposures, sickness and mortality, and [his] evaluation of [its] operations" would be kept confidential. In response to this decision, Cantlon advised Philip Carey that he would be in touch with Dr. Mancuso and that he would keep Philip Carey informed of information or develop-

ments affecting the industry and company. Cantlon also advised Philip Carey that "[i]n Dr. Mancuso's mind, it is definite that there will be considerable publicity, investigation and scientific, medical and engineering advances, all in relation to asbestosis, not only as an occupational hazard, but as a health hazard." The desire to keep Dr. Mancuso's observations and evaluation confidential does not show actual knowledge of a health hazard to an individual working as an insulator. Nor did the opinion that there will be considerable advances made in relation to asbestosis as a health hazard show present knowledge that an insulator was at risk or that such information became available during the relevant time period herein.

■ On October 26, 1964, Dr. Mancuso wrote to John Cantlon informing him of a conference in New York on asbestos exposure. Angotti argues that Dr. Mancuso's letter establishes actual knowledge by Philip Carey of the health hazards to insulators from Philip Carey's asbestos products. The letter was admitted in evidence with certain portions expunged. In pertinent part, as argued by Angotti, the letter provided as follows:

1. There is now agreement on an International level, from the facts and evidence presented, that there is an irrefutable association between asbestos [xxx] [2] [xxxxxx]. At present this association has been established for [xxxxxxxxxxxxxxxxxxxxxx] and of the [xxxxxxxxx] and of the [xxxxxxxxxxxxxxx] (in the form of [xxxxxxxxxxxxxxx]. There is suggestive evidence but not established for [xxxxxx] [xxxxxxxxxxxxxxxxxxx] [xxxxxxxxxxxxxxxxx].

2. There is now substantial evidence, that [xxxxxxx] [xxxxxxxxxxxxxxxxx] have developed in environmentally exposed groups, ie. due to air pollution groups, living near asbestos plants, and asbestos mining operations, but not occupationally exposed.

3. Evidence has also been established for [xxxxxxxxxx] developing among members of the household, ie. relatives of workers who are employed in the asbestos plants. [xxxxxxxxxxxxxxxxxxxxxxxxx] have developed among wives, laundering the work clothes of asbestos workers.

. . . .

There should be no delusion, that the problem will disappear or that the consumer or working population will not become aware of the problem and the compensation and legal liability involved.

The expunged portions of the letter render the sentences from which words were expunged meaningless. Furthermore, Mancuso's caution that the problem will not disappear or that the consumer and working population will become aware of the problem does not establish a level of exposure to asbestos dust sufficient to show actual knowledge of a health hazard to insulators working with asbestos products.

■ On November 27, 1964, Cantlon suggested to Philip Carey that Dr. Mancuso was available to conduct a further investigation regarding asbestos exposure. Philip Carey decided not to have Dr. Mancuso conduct a further investigation. On May 4, 1966, Dr. Mancuso wrote to Philip Carey stating that there was an increasing awareness and sensitivity among insulation workers and users of asbestos, in regard to the possible subsequent biological effects. Dr. Mancuso warned that "[t]he situation that now confronts all industry users and manufacturers of asbestos products is quite formidable and requires a serious reappraisal and the development of specific plans of operation." Dr. Mancuso told Philip Carey that if it was ready or interested in some serious discussion relative to their overall medical and related activities, that he would be glad to talk to them. A warning of possible effects or that the situation is formidable does not establish actual knowledge of a health hazard to an

---

**2.** All bracketed portions with x's indicate portions of Mancuso's letter that were expunged

prior to the letter being admitted in evidence.

individual handling asbestos products as an insulator. The record does not show what information Mancuso had available or that further investigation by Philip Carey at that time would have revealed a health hazard to insulators.

■ On June 20, 1967, Cantlon sent Philip Carey an article from the New York Times which Cantlon stated verified what Dr. Mancuso was forecasting, "that even the minor use of asbestos may someday be considered as dangerous to the general populace." A forecast of what may be determined in the future does not establish present knowledge that a health hazard existed for those working as insulators.

The foregoing evidence and the reasonable inferences drawn from it, even when taken in the light most favorable to the respondents, is not sufficient to show that Philip Carey had actual knowledge of the dangerous health hazards to asbestos installers such as William Angotti for the period of time that he was using Philip Carey products. In addition, the record here no where establishes that Philip Carey consciously chose to ignore information otherwise available to show that its products were actually known to constitute a health hazard to insulators. Celotex was entitled to a directed verdict on its behalf on the issue of punitive damages.

Celotex next argues that it was entitled to a directed verdict at the close of all the evidence because the evidence showed that William Angotti was guilty of contributory fault as a matter of law.

■ Contributory fault may be submitted by M.A.I. 32.23 as a defense in a strict products liability case. *Harper v. Namco, Inc.*, 765 S.W.2d 634, 636–38, (Mo. App.1989). M.A.I. 32.23 instructs the jury that it must return a verdict for the defendant if it finds the plaintiff knew of and appreciated the danger in the use of a product (as described in the plaintiff's verdict director), but nevertheless voluntarily and unreasonably exposed himself to such danger, thereby directly causing or contributing to cause his damages.

Once again, the test to determine when a directed verdict is appropriate as set forth under the first point herein, is whether reasonable and honest men could differ on the correct disposition of the case, reviewing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff, William Angotti. *Love v. Deere & Company*, 720 S.W.2d at 789; *Norris v. Jones*, 687 S.W.2d at 281.

■ In support of its argument on this point, Celotex refers to the following testimony of William Angotti: William Angotti first learned in 1968 that there was danger to asbestos; Angotti subscribed to the Asbestos Workers Journal and he continued to work with asbestos after he learned that asbestosis was a possibility from exposure to asbestos and he did not wear a mask or respirator even though some of his co-workers did; Angotti continued to work in the asbestos industry through 1982.

This testimony does not establish as a matter of law that Angotti voluntarily and unreasonably exposed himself to Celotex's products knowing and appreciating the danger to him. By 1968, Angotti had already worked in the asbestos industry for twenty years. The fact that he worked with the products of other companies and that he continued in the asbestos industry until 1982 were all issues for the jury to resolve given that each exposure to asbestos is now known to contribute to the disease of asbestosis. Furthermore, the fact that Angotti learned in 1968 that there was "danger" associated with asbestos does not unequivocally establish that he knew and appreciated the danger to himself. There was no evidence of Angotti's understanding of the level of danger, the nature of the danger or who was at risk. Likewise, the evidence that Angotti learned that asbestosis was a possibility from exposure to asbestos or that he did not wear a mask or respirator does not necessarily establish knowledge and appreciation of danger to himself.

Celotex was not entitled to a directed verdict on the basis of contributory fault as a matter of law.

■ Celotex next argues that the trial court erred in failing to bifurcate the liability issues from the punitive damage issues because the punitive damage evidence was inflammatory and prejudicial.

Celotex cites no direct authority for its position, but does reference recent legislation in regard to bifurcation of proceedings when punitive damages are in issue. Section 510.263, RSMo Supp.1990, provides that all actions tried before a jury involving punitive damages shall be conducted in a bifurcated trial before the same jury if requested by any party. However, this section does not support appellant's argument for two reasons. One reason is that the effective date of § 510.263, RSMo Supp.1990, is July 1, 1987, which is after the cause of action herein accrued. The second reason is that even under the provisions of § 510.263, RSMo Supp.1990, the issues of actual and punitive damages are both submitted to the jury in the first stage of the proceeding. Then, only if the jury determines that the defendant is liable for punitive damages, is a second hearing held to determine the amount. Sections 510.-263.2 and .3, RSMo Supp.1990. The issues of actual and punitive damages are not heard separately as advocated by Celotex even under this section.

Celotex's argument that the trial court erred by not conducting a bifurcated proceeding on the issues of actual and punitive damages is denied.

In its final point, Celotex argues that the trial court erred in admitting certain exhibits because said exhibits were hearsay and/or opinion testimony and were not admissible pursuant to the business records exception of § 490.680, RSMo 1986.

■ Section 490.680, RSMo 1986, provides that business records are admissible where certain criteria are met and states as follows:

A record of an act, condition or event, shall insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

William Angotti's action was for product liability which was submitted pursuant to the doctrine of strict liability in tort. Angotti sought both actual and punitive damages. To recover actual damages under the doctrine of strict liability, a plaintiff must establish 1) the product was defective and dangerous when put to a use reasonably anticipated by the manufacturer and 2) the plaintiff sustained injury or damage as a direct result of the defect. *Lewis v. Envirotech Corp.*, 674 S.W.2d 105, 110 (Mo.App.1984). As stated previously herein, to recover punitive damages in a strict product liability action, the plaintiff must show that the defendant had actual knowledge of the defect and danger at the time the product was sold. *School District of Independence v. U.S. Gypsum Company*, 750 S.W.2d at 446.

The majority of the challenged exhibits were obtained from the contents of a file acquired during the deposition of John Cantlon. Since the 1930's, Cantlon had familiarized himself with medical literature concerning the effect dust has on a person's lungs. The literature gathered by Cantlon on this subject was passed on in the form of information to his client, Philip Carey.

■ Celotex first objects, on relevancy grounds, to the admission of Exhibit 35, a cover letter written by Cantlon to Philip Carey which in part summarizes the contents of the enclosed reports of Dr. Mancuso and an article on asbestos. Relevant excerpts are as follows:

There is a danger, therefore, that a condition either exists, or the fear or such a condition will exist, that will affect not only your own employees, but the employees of companies which purchase your products for use, or even the customers of your end products.

You have, of course, foreseen the problem and have retained as your consulting medical director Dr. Mancuso, who is the

person best qualified to assist you in investigating the matter and to advise and guide you in solving it.

The letter was relevant in an effort to show both that Philip Carey's products were dangerous and to attempt to establish that Philip Carey had actual knowledge of the danger.

■ Exhibits 34 and 37 are challenged on the basis that they do not qualify as business records. Both exhibits are letters written by Dr. Mancuso to a Mr. L.J. Knippa, plant manager of Philip Carey. These exhibits were prepared by Dr. Mancuso at the offices of John T. Cantlon and Associates and typed by Cantlon's secretary. They were kept in the ordinary course of Cantlon's business as a part of his responsibility to Philip Carey and were therefore admissible.

■ Exhibit 40, a letter from Cantlon to Mr. Pechstein referring to an enclosed article from Dr. Mancuso, is objected to on relevancy grounds. The letter was offered and was relevant for the purpose of showing that Dr. Mancuso continued to provide information to Philip Carey concerning the hazards of asbestos after his services were terminated, and consequently, to attempt to show that Philip Carey had actual knowledge of health hazards.

■ Exhibits 42 and 45, letters from Dr. Mancuso to Cantlon, are challenged as not being admissible as business records because the documents were written subsequent to the time that Dr. Mancuso's services were terminated by Philip Carey.

These documents were kept in the ordinary course of Cantlon's business and were forwarded to Philip Carey. They were relevant to the continued knowledge, concerning the hazards of asbestos, provided to Philip Carey.

■ Exhibits 43 and 49, letters written from Cantlon to Mr. Pechstein, are challenged on the basis of relevancy. Both exhibits detail and enclose further findings of Dr. Mancuso and are relevant to plaintiff's attempt to demonstrate notice on behalf of Philip Carey.

■ Exhibit 51, a letter written by Cantlon to Mr. Pechstein is challenged as irrelevant. The letter explains that Cantlon is enclosing an article from the New York Times newspaper which verifies Dr. Mancuso's forecast concerning the use of asbestos. This exhibit was relevant and admissible in an effort to show that Philip Carey was put on notice of the hazards of asbestos.

■ The remainder of the challenged exhibits are the Workers' Compensation Summary Cards which were referred to in the first point discussed herein. Celotex argues that these cards were inadmissible on the basis of relevancy because they pertain to plant workers and not insulators. The complained of exhibits were offered to refute the contention that Philip Carey did not know of the hazards of asbestos in the 1950's and early 1960's. These cards were relevant in an effort to show that exposure to asbestos dust complaints were being filed by employees of Philip Carey as early as 1946 and in an effort to show that Philip Carey had actual knowledge that exposure to asbestos dust constituted a health hazard to asbestos insulators.

Celotex's final point is denied.

The judgment awarding punitive damages to William Angotti is reversed. In all other respects the judgment is affirmed.

SHANGLER, P.J., concurs.

KENNEDY, J., dissents in separate dissenting opinion.

KENNEDY, Judge, dissenting.

I am unable to agree with my estimable colleagues in their holding that plaintiffs failed to make a submissible case for punitive damages against Philip Carey. The effect of their opinion is that defendant's knowledge of the defective product's danger, in order to justify a punitive damages submission, is not merely "actual" knowledge, but is specific, exact and certain knowledge. I do not think the cases cited therein require proof of such a high order of understanding on the defendant's part.

There was abundant evidence available to Philip Carey during the relevant period of time, and actually communicated to their officials, from which a jury could conclude—as they did—that Philip Carey knew of the hazard presented by use of asbestos. If Philip Carey knew of the hazard presented to its employees by their exposure to the material, the jury could believe from the evidence that it knew also of the hazard presented to others, who, like plaintiff, would be handling, cutting and sawing the material and freeing the asbestos fibers into the air in enclosed spaces. (Incidentally, I do not think Dr. Mancuso's letter of October 26, 1964, was rendered meaningless by the redactions.) Viewing the evidence favorably to the verdict, it appears to me that Philip Carey's knowledge of the hazard of asbestos could have been found by the jury to have reached a level at which its continued sale and distribution of the product showed, in the language of MAI 10.04, "complete indifference to or conscious disregard for the safety of others".