**Leonard DRABIK, Plaintiff,**

v.

**STANLEY–BOSTITCH, INC. and Bostitch, a Division of Textron, Inc., Defendants.**

**No. 90–0322–CV–W–6.**

United States District Court, W.D. Missouri, W.D.

Aug. 18, 1992.

Paul L. Redfearn, Redfearn & Brown, P.C., Kansas City, Mo., for plaintiff.

David R. Buchanan, Brown & James, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

SACHS, Chief Judge.

For reasons stated, the court will deny the post-trial motion of defendant Bostitch, a division of Textron, Inc.

Plaintiff brings this product liability case because of injury suffered when a pneumatic nailer (often called a nail-gun) fired a nail into his head, causing brain damage, while plaintiff was a member of a two-man carpentry crew. Plaintiff's companion on the job, using the nailer in a manner common in the trade, was holding the equipment with the trigger depressed so the nailer would automatically fire on contact. An efficient and quick method of nailing is to use pneumatic nailers so that nailing can occur in a bumping or bouncing manner. Unfortunately, plaintiff had bent down during a pause in the nailing operation and raised his head into an area where his companion happened to be holding the nailer, ready to fire.

Another, somewhat slower and slightly more strenuous, method of pneumatic nailing uses a "sequential trip," in which the trigger is ineffective unless prior contact has been made with the object to be nailed. This requires pressing the trigger each time a nail is driven. Defendant Bostitch had developed and patented a sequential trip nailer in the early 1970s, but reverted to primary manufacture and sale of the contact trip nailer, over objection by its safety engineer, Ed Colechia.

An instruction manual supplied with the contact trip nailer in 1984 recommends against holding the trigger depressed while "carrying" the nailer. There was evidence, however, that the location of the trigger invites carrying the nailer with the trigger depressed, and that the instruction manual is generally unavailable or disregarded (as defendant knew was likely). Subsequent models contain warnings against depressing the trigger "when not driving fastener." The recommended use would be iden-

tical to that used in the sequential trip nailer. If so used there would be no advantage in using the unguarded nailer rather than the sequential trip nailer; therefore, industry popularity of the contact trip nailer suggests anticipated disregard of the warning label. There was testimony from defendant's engineer acknowledging common disregard of such instructions.

Personal injuries like those suffered by plaintiff occurred before and after the manufacture in 1984 of the nailer in question. Defendant continues to advocate use of the contact trip nailer.

Plaintiff's physical recovery from his injury has been very satisfactory, according to most of the evidence. There was some testimony, however, that plaintiff's thought processes have been badly and permanently affected, that he becomes confused and has loss of memory and seizures from brain damage, and that his carpentry work is restricted by inability to work at heights. An adverse personality change is also claimed, evidenced by frequent anger and signs of frustration. There was evidence of economic loss, based on a calculation of the discounted earnings of the average disabled person.

The jury awarded $1.5 million in actual damages and $7.5 million in punitive damages.

1. Plaintiff is not pursuing a claim against Stanley–Bostitch, Inc., the current supplier, presumably because Textron, Inc., was the culpable party and has a sufficiently deep pocket, a net worth of $2.7 billion.

2. It may be acknowledged that my comments may have been influenced by public policy questions. It seems extraordinary and very possibly unsound for a single jury to have authority, by granting punitive damages, to "send a message" to an entire industry, designed to stop production and sale of commonly used carpentry equipment. I have concluded, however, that such questions should be resolved by legislation, administrative regulation, or by common law rulings by appellate courts having authority to establish local tort law. Unlike the jury action in *Linegar v. Armour of America, Inc.*, 909 F.2d 1150, 1154 (8th Cir.1990), where it was concluded the jury was usurping a legislative function, it here appears that the jury was acting within the authority granted by Missouri law, once it appropriately found that an unreasonably dangerous product was being made for sale and use here.

Defendant Bostitch seeks a new trial, or judgment notwithstanding the verdict.[1] The punitive damage submissibility issue is the most strenuously controverted point, no doubt fueled in part by my expression during trial that I was doubtful about the submissibility of such damages in this case under current Missouri law.[2]

### I.

I am somewhat troubled by the size of the actual damage award. My reaction to the evidence is less credulous than that of the jury. The matter is not greatly contested by defendant, however, and my rule of deference is almost as great as in FELA cases, where I have declined to interfere with a verdict that seemed overly generous. *Kelly v. Illinois Central Gulf Railroad Co.*, 552 F.Supp. 399 (W.D.Mo.1982).

### II.

Apart from the public policy issues that continue to trouble me, I have concluded that there is an evidentiary basis for punitive damages, and that an award of $7.5 million is not inappropriate, when designed to "deter" the entire pneumatic nailer industry from continuing to produce and distribute contact trip nailers.[3]

3. A $25 million punitive damage award in a products liability case has been accepted in a neighboring state. *Mason v. Texaco, Inc.*, 741 F.Supp. 1472 (D.Kan.1990). It is well established that the amount of punitive damages must not only bear a reasonable relationship to the injury inflicted and punishment for outrageous conduct but should be sufficient to "deter similar conduct in the future." *Van Eaton v. Thon*, 764 S.W.2d 674, 677 (Mo.App.1988). Remittitur or other relief would probably be "inconsistent with the principal purpose of punitive damages, which is to deter." *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145 (7th Cir.1985) (Posner, J.). In view of the adamant defense of the contact trip nailer, the jury was perhaps well advised to award $7.5 million as punitive damages, if, as is apparent, it took its deterring authority very seriously. *Compare, Central Telecommunications, Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711 (8th Cir.1986) ($25 million award for tortious interference).

Defendant's argument may be summarized as follows: (1) the 1984 instruction manual warning and the warning label used after 1984, even though inadequate to change industry practice, undermines any submission of an issue of "complete" indifference to user safety, or "conscious disregard" of safety factors; (2) following industry standards protects against a punitive damage award; (3) the offering of a safer product as an option protects against a punitive damage award; and (4) the evidence does not fairly allow a finding of outrageous conduct.

The single most contested issue relates to the instruction manual as a defense. Defendant relies on Judge Blackmar's statement, for the Missouri Supreme Court, that mere "inadequate communication cannot be equated to conscious disregard." *Bhagvandoss v. Beiersdorf, Inc.,* 723 S.W.2d 392, 398 (Mo.1987). The Missouri court has also advised that "punitive damages may not be awarded even for exaggerated negligence" and "neither inadvertence nor bungling can be equated to 'complete indifference.'" 723 S.W.2d at 397.

The parties have cited authorities arguably pointing both ways on whether plainly ineffective warnings can sometimes serve as a defense to punitive damages.[4] Defendant fails, moreover, to read *Bhagvandoss* in context. Unlike the present case, "no expert even intimated that the appellant should cease sales." 723 S.W.2d at 398. The Missouri Supreme Court concluded that punitive damages could not be awarded for "not recalling the product simply because of the initial reports...." *Id.* Where, as in this case, the product is claimed to be so defective that production and distribution should be stopped, the soundness of warnings becomes immaterial. In the present case it is contended that contact trip nailers are so dangerous that they must be banned, by jury action if not otherwise, and that marketing the product is itself outrageous. The punitive damage issue does not turn on a quibble about communications.

The other affirmative claims of defendant regarding punitive damages are not controlling, even though compliance with industry standards and offering safer options may have evidentiary value. *See, Lane v. Amsted Industries, Inc.,* 779 S.W.2d 754, 759 (Mo.App.1989); Instruction K, requested by defendant. It is conceivable that in some cases, where the proof of outrageous conduct is thin or arguably nonexistent, such defenses may provide the evidentiary straws that avoid submissibility. I find no basis for giving this proof overriding effect in the present case.

It would not be productive to try to piece together each bit of evidence that in my judgment authorized the jury in this case to be outraged. The briefing is sufficient, together with my recollection of the proof, to conclude that defendant, and the industry, have been producing and selling contact trip nailers, well knowing that, as generally used, there will be an occasional personal injury of a grievous nature, including nails driven into the heads of carpenters, because of the way the nailers are designed. In my judgment the jury was authorized to find this outrageous, even though a rare event, and even though the equipment is quite useful and injuries generally occur when there is some inadvertence on the part of nailer handlers and their companions.

Defendant's engineer, Richard Paul, had testified to engineering practice to avoid safety hazards, even though injuries are practically nonexistent—"one in a million." This record made it very difficult to argue what I conceive to be the best defense, the infrequency of injury when weighed against the utility of speedy, easy operation, invariably safe when reasonable precautions are taken.

There are cases where judges may insist on interposing their own opinions when ju-

---

**4.** Plaintiff probably has the better of this argument, based on my understanding of the facts, where the instructions seem hardly to have been seriously expected to reach all users or to be effective with many of them. Defendant knew the instructions would be insufficient in both respects. Defendant complains that plaintiff relies on "constructive knowledge," based on what it should have known. I believe he relies on actual knowledge, circumstantially proven.

rors have acted irrationally, carried away by sympathy or a uniquely appealing injury. In this case, however, although there is some merit in the contention that the jury should have treated occasional injuries as a necessary cost of industrial efficiency, I do not see a duty to strip the jury of its powers. On the contrary, there are special factors here, including the apparently cynical use of the warning label[5] and the commercial managers' disregard of safety advice by Textron's engineering staff, that not only authorize recovery but also a punitive award in an amount likely to have industry impact.[6]

### III.

■ Submissibility of design defect is implicit in my punitive damage analysis. Plaintiff's argument seems to advance a version of assumption of the risk (in his consumer expectation theory) and the related concept of open and obvious danger. We can all agree with plaintiff that one does not have to be an Einstein to understand what could go wrong. Neither Daniels, who held the nailer, nor plaintiff had an obligation, however, to shrink with horror from working with or fairly near the equipment, or suffer the consequences. Daniels did not realize his companion's head was about to contact his nailer, and there is no evidence that plaintiff realized the nailer was in very close proximity to his head as he rose from his work.[7] Double inadvertence was necessary to cause the alarming result. I find nothing in Missouri law, such as the necessity for a particular "malfunction," that bars a jury from find-

ing unreasonable danger in the design of the contact trip nailer. In a general sense the jury could find that the contact trip nailer is comparable to a multipiece tire rim, an accident waiting to happen. *See Wolf v. Goodyear Tire & Rubber Co.* 808 S.W.2d 868 (Mo.App.1991).

### IV.

Defendant asks for instructions not required under Missouri practice and in my judgment either misleading or unduly complicating. It is difficult to understand the current objection to the risk/benefit addition to the standard Missouri instructions. The instruction gave something for defendant to argue (as it does here), that commercial necessity, industry preference, etc., justifies exposing small numbers of persons to the risk of personal injury. Without risk/benefit analysis the jury has unguided discretion to evaluate risk and place any label on it that suits its subjective feeling. While Missouri practice allows such a submission, it is surely helpful to the defense to introduce the weighing process.

■ Defendant strenuously contends that the court erred in failing to submit to the jury the issue of whether plaintiff knew of the danger and voluntarily encountered a known risk. While his knowledge of the possibility of personal injury from a contact trip nailer is clear, and it might not be speculative to suppose that plaintiff, like defendant's personnel, knew that nailers are generally or frequently held with the

---

5. On reflection, defendant's embarrassment seems aggravated by being forced to advocate at trial the alleged safety of bump-nailing, in light of the label in use since 1985, in effect advising against that very procedure. Defendant argues that adverse inferences from the use of the warning label should not be considered. No limiting instruction was requested, to the best of my recollection, and it seems probable that the text of a warning label adopted shortly after the sale of the nailer would be probative, for better or worse, of defendant's state of mind in 1984. *Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373, 1381 (10th Cir.1989). *Compare, Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322, 1336 (8th Cir.1985) (post-sale *knowledge* not a basis of punitive damages).

6. I do not discount the possibility that there could be evidence and argument leading to a different result. On this trial record, however, I accept the verdict. This comment, incidentally, reinforces my doubt that the current method of determining product liability for punitive damages is the best that could be devised.

7. Defendant does not satisfy me that the Daniels deposition testimony (if treated as substantive rather than impeaching evidence) sufficiently proves that a noisy nailing operation was occurring just above plaintiff's head.

**1276**

trigger depressed, my conclusion from the evidence was and is that it would be speculative to guess whether plaintiff might have realized he and Daniels were positioned so that he was within a dangerous range of the nailer being held by Daniels.[8] The absence of proof required, in my judgment, omission of the theory of defense now reasserted. To repeat the analogy made during trial, a general sense of limited danger may be inferred, as any passenger boarding an airplane might feel, but there is no showing of specific knowledge of a particular danger, such as recognizing the pilot as someone in an advanced stage of intoxication. It is error to submit a contributory fault instruction unless there is proof of appreciation of a specific danger, though not necessarily the technical details. E.g., *Boyer v. Eljer Mfg., Inc.*, 830 S.W.2d 535, 539 (Mo.App.1992); *McLaughlin v. Fellows Gear Shaper Co.*, 786 F.2d 592, 598–9 (3d Cir.1986) ("momentary inattention or inadvertence" insufficient).[9]

Recognizing plaintiff's counsel's ability and incentive to respond fully to all other contentions of defendant, which have been reviewed and considered by the court, it seems unnecessary to explicitly examine all other contentions of error. I am satisfied that the issues in the case were really quite simple and easy to understand, that they were adequately presented to the jury by both sides, and that the jury reached a permissible result.

The motion for judgment notwithstanding the verdict or for a new trial is hereby DENIED.

---

**8.** It might even be stretching things to charge plaintiff with negligent inadvertence. Any supposed negligence would not be a defense, and would not allow apportionment of fault, under the law applicable to this case. *Lippard v. Houdaille Industries, Inc.*, 715 S.W.2d 491 (Mo. 1986). It is not conceivable to me that a Missouri court that would reject apportionment of fault would allow a total preclusion of recovery under the facts of this case.

**9.** *Gunderson v. Sani–Kem Corp.*, 674 S.W.2d 665, 671 (Mo.App.1984), is not in conflict with this conclusion. It held there was no contributory fault as a matter of law. Since the jury found for plaintiff it was not necessary to consider submissibility of the defense. Plaintiff's reflex action as a cause of injury was cited in the opinion as a factor inconsistent with the defense.